PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LYNN LEWIS TAVENNER,
              *Plaintiff-Appellee,*

v.

KENNETH R. SMOOT,
              *Defendant-Appellant,*

and

No. 00-1912

KATINA SMOOT, a/k/a Katina
Lombardo; CORY R. SMOOT; GINA
SMOOT; HOME CHECK SERVICES;
GLASS APPLE, INCORPORATED,
              *Defendants.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-99-738-3, AP-99-3006)

Argued: June 4, 2001

Decided: July 16, 2001

Before WILKINS and MOTZ, Circuit Judges, and
Irene M. KEELEY, Chief United States District Judge
for the Northern District of West Virginia,
sitting by designation.

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Wilkins and Chief Judge Keeley joined.

**COUNSEL**

**ARGUED:** Brett Alexander Zwerdling, ZWERDLING & OPPLE-MAN, Richmond, Virginia, for Appellant. Dion William Hayes, MCGUIRE WOODS, L.L.P., Richmond, Virginia, for Appellee. **ON BRIEF:** John H. Maddock, III, MCGUIRE WOODS, L.L.P., Richmond, Virginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

In this case we must resolve whether a bankruptcy trustee can avoid a transfer of potentially exempt property on the ground that the debtor transferred the property with the intent to hinder, delay, or defraud his creditors under 11 U.S.C. § 548 (1994). For the reasons that follow, we conclude that the trustee may do so.

I.

The parties agree on the essential facts. In 1978, Kenneth Smoot began working for CSX Transportation in Virginia. As a condition of his employment, Smoot joined the United Transportation Union ("the Union"). In the early 1980's, in order to supplement his income during periods of unemployment or lay-offs from CSX, Smoot established an unincorporated entity known as Glass Apple, which offered home repair and other services.

In April 1995, after a series of unpleasant dealings with CSX and the Union in Virginia, Smoot transferred his employment with CSX to Ohio. Fifteen months later, Smoot suffered a work-related injury when the flooring of a locomotive engine gave way causing damage to Smoot's knees and body. As a result of the accident, Smoot underwent knee surgery in 1996 and could not work for parts of 1996 and 1997. Due to his health and other personal problems, in June 1997, Smoot left his position with CSX, sold his home in Ohio and returned to Virginia.

CSX and the Union subsequently brought suit against Smoot for violations of the Federal Wiretapping Act, 18 U.S.C. § 2511 (Supp. II 1996), in connection with Smoot's illegal tape-recording of a meeting, which had been convened to consider Smoot's grievances against CSX and the Union. Smoot, in turn, filed suit against CSX under the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51 *et seq.* (1994), seeking compensation for his work-related injury.

In January 1998, Smoot incorporated Glass Apple as a Virginia corporation. Smoot testified at his bankruptcy hearing that he did this in the hope of establishing a family business and a potential source of income for himself and his family because he believed that, due to his injury, he would no longer be able to perform manual labor. The incorporation papers listed Smoot as the President of Glass Apple, his wife Katina as the Vice President, his son, Cory, as the Secretary and Treasurer, and Smoot and his wife as the company's directors. Katina Smoot owned 50% of Glass Apple's stock, and Smoot's two children owned, in equal amounts, the remaining 50%; Smoot himself owned no Glass Apple stock. Through its various divisions, Glass Apple engaged in a diverse set of operations, ranging from home repair to music production to off-shore investment. One of these divisions, Home Check Services, handled the company's finances.

On March 30, 1998, the United States District Court for the Northern District of Ohio found Smoot liable to CSX and to the Union under the Wiretapping Act. The court took the issue of the amount of damages under advisement. Three months later, Smoot and CSX entered into an agreement settling Smoot's FELA claim against CSX in connection with his 1996 work-related injury. Pursuant to the settlement agreement, CSX agreed to pay Smoot $250,000 in exchange for a release of all of Smoot's claims against the railroad. After deducting amounts for advances and other outstanding debts, CSX deposited a net amount of $217,059.25 into a bank account held jointly by Smoot and his wife at a credit union in Ohio. That same day, Smoot wire-transferred $210,000 from the joint account at the credit union to Home Check Services' bank account in Virginia.

In August 1998, the Ohio district court ordered Smoot to pay $170,000 in damages to CSX and $180,000 in damages to the Union.

The following month, the district court ordered Smoot to pay CSX an additional $25,000 in attorney's fees.

During the summer and fall of 1998, Smoot made several purchases using funds from the Home Check Services bank account, including cars for his wife and daughter and a motorcycle for his son. Smoot also wrote checks from this account to himself and to his son Cory for "wages." In addition, Smoot loaned Cory $10,000 from the Home Check Services account, which Cory used to make a down payment on a house. During this same period, Smoot wrote two checks from the Home Check Services' account made payable to First Union in the amounts of $100,000 and $40,000; these funds were deposited into a First Union bank account held in the name of Glass Apple.

In December 1998, the Union brought suit against Smoot, his family members, and Glass Apple in the Circuit Court of Chesterfield County, Virginia seeking to set aside these transfers as fraudulent or voluntary and to have these assets made available for satisfaction of its judgment against Smoot. The Union also filed an ex parte petition for attachment. After the Union posted the necessary bond, the Virginia court issued a writ of attachment, ordering the county sheriff to attach by levy the specified property. Shortly thereafter, CSX filed a petition to intervene in the suit.

Before the state court could hold a hearing on its writ of attachment, Smoot filed a petition for Chapter 7 bankruptcy. The bankruptcy schedules, as amended, claimed an exemption in the amount of $217,000 for the funds Smoot received in connection with the settlement of his FELA suit against CSX. Lynn Tavenner was appointed bankruptcy trustee. In January 1999, Tavenner filed this adversary proceeding objecting to Smoot's discharge in bankruptcy and seeking to avoid and recover the transfers made with the checks drawn on the Home Check Services' account on the ground that, inter alia, Smoot transferred the funds with the intent to defraud his creditors. Tavenner also objected to Smoot's claimed exemption of the $217,000.

After holding a hearing on the trustee's objections, the bankruptcy court issued a written opinion declaring that the trustee could avoid the transfers and recover the funds, and denying Smoot a discharge

in bankruptcy. The district court upheld the bankruptcy court's decision, and Smoot then appealed to this court.

In bankruptcy actions, we review the district court's judgment and the bankruptcy court's conclusions of law de novo; we review the bankruptcy court's findings of fact for clear error. *See Chmil v. Rulisa Operating Co. (In re Tudor Assocs., Ltd., II)*, 20 F.3d 115, 119 (4th Cir. 1994). In assessing the bankruptcy court's findings of fact, we must give "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankr. Rule 8013.

II.

Indisputably, had Smoot left the proceeds from the settlement of his FELA suit against CSX in his account, he could have exempted those proceeds from his bankruptcy estate under Virginia law, which creates a statutory exemption for money recovered in a personal injury action. *See* Va. Code Ann. § 34-28.1 (Michie 1997).[1] This case, therefore, presents the novel issue of whether transfers of property that would have been exempt from the bankruptcy estate under state law can be the subject of an avoidance and recovery action by the bankruptcy trustee, and whether a debtor may be found to have transferred such property fraudulently.

---

[1]Virginia law governs whether the property is subject to exemption because Virginia has opted out of the federal statutory scheme defining exempt property. *See* Va. Code Ann. § 34-3.1 (Michie 1997). As part of an individual debtor's "fresh start," the debtor may exempt, and thus hold free from the claims of the trustee and most creditors, certain property of the bankruptcy estate. *See* 11 U.S.C. § 522(b) (1994); *In re Massey*, 225 B.R. 887, 890 (Bankr. E.D. Va. 1998). The property that may be exempted includes the property specified in § 522(d) of the Bankruptcy Code or, alternatively, the property specified by state and general federal law. *See id.*; *Massey*, 225 B.R. at 890. The Bankruptcy Code permits a state to preclude its residents from taking advantage of the federal exemptions listed in § 522(d). *See* 11 U.S.C. § 522(b)(1). "Virginia has done precisely that." *Massey*, 225 B.R. at 890 (citing Va. Code § 34-3.1.) Accordingly, residents of Virginia filing bankruptcy petitions may claim *only* those exemptions allowable under Virginia law and general federal law. *See Massey*, 225 B.R. at 890.

A.

Initially, we must determine whether transfers of property that would have been exempt from the bankruptcy estate under state law can be the subject of an avoidance and recovery action by the bankruptcy trustee.

As the bankruptcy court noted, in its thorough and well-reasoned opinion, courts hold "divergent views regarding whether transfers of exemptible property can be avoided by trustees." *Kapila v. Fornabaio (In re Fornabaio)*, 187 B.R. 780, 782 (Bankr. S.D. Fla. 1995). Some courts have followed the so-called "no harm, no foul" approach, holding that the trustee cannot avoid the transfer because, absent the transfer, creditors could not have reached the property, and thus the transfer did not harm them in any way. *See id.* at 782-83; *Jarboe v. Treiber (In re Treiber)*, 92 B.R. 930, 932 (Bankr. N.D. Okla. 1988). A majority of courts have rejected this approach, however, noting that under the bankruptcy laws, as revised in 1978, all property, including potentially exempt property, is part of the bankruptcy estate until the debtor claims an exemption for it; consequently, a transfer of potentially exempt property could harm creditors because it might not have actually been exempted from the bankruptcy estate. *See, e.g.*, *Lasich v. Wickstrom (In re Wickstrom)*, 113 B.R. 339, 350 (Bankr. W.D. Mich. 1990). For two reasons, we believe that the majority position — that transfers of exemptible property *are* amenable to avoidance and recovery actions by bankruptcy trustees — is better reasoned.

First, § 522(g) of the Bankruptcy Code apparently anticipates this result. *See* 11 U.S.C. § 522(g) (1994). That statute permits the debtor to exempt property recovered by the trustee under certain circumstances, namely if the debtor could have exempted such property had it not been transferred and if the transfer was involuntary and the debtor did not attempt to conceal the property. *See id.* Section 522(g) is, thus, premised on the notion that a bankruptcy trustee can avoid the transfer of exemptible property and recover the property.

Second, as the *Wickstrom* court explained, the "no harm, no foul" approach is misguided. Under a statutory scheme in which all property is presumed to be part of the bankruptcy estate, and no property is exempt until such time as the debtor claims an exemption for it,

creditors *can* be harmed by transfers of potentially exempt property because it is not a foregone conclusion that such property will be exempt from the estate. Potentially exempt property can be used to satisfy the demands of the creditors if the debtor never claims the exemption. Thus, the so-called "no harm, no foul" approach is inconsistent with the Bankruptcy Code. For these reasons, we conclude that transfers of potentially exempt property are amenable to avoidance and recovery actions by bankruptcy trustees.

## B.

We next turn to the question of whether Smoot can be held to have transferred the FELA settlement proceeds fraudulently. The trustee seeks to avoid the transfer of this exempt property under 11 U.S.C. § 548(a)(1)(A), which states, in pertinent part:

> The trustee may avoid any transfer of an interest of the debtor in property . . . that was made . . . on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily —
>
> > (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted.

Smoot claims, however, that these transfers cannot be characterized as fraudulent because it is impossible to hinder, delay or defraud creditors by transferring property to which the creditors were not entitled in the first place.

Notwithstanding Smoot's protestations to the contrary, such transfers surely can be characterized as fraudulent, so long as the debtor had the requisite fraudulent intent. Nothing in § 548 indicates that a trustee must establish that a fraudulent conveyance actually harmed a creditor. Nor does § 548 exclude from its scope transfers of exempt property. *See* 11 U.S.C. § 548(a)(1)(A). Rather, § 548 states that "[t]he trustee may avoid *any* transfer of an interest of the debtor in property" if the transfer or obligation is entered into with the requisite intent. 11 U.S.C. § 548(a)(1)(A) (emphasis added).

Section 548 properly focuses on the intent of the debtor, for if a debtor enters into a transaction with the express purpose of defrauding his creditors, his behavior should not be excused simply because, despite the debtor's best efforts, the transaction failed to harm any creditor. *See Davis v. Davis (In re Davis)*, 911 F.2d 560, 562 (11th Cir. 1990) ("To hold now that there occurred no transfer of property with the intent to hinder creditors merely because the debts on the residence exceeded its . . . value would be to reward appellant for his wrongdoing, which this court refuses to do.") (quoting *Future Time, Inc. v. Yates*, 26 B.R. 1006, 1009 (M.D. Ga. 1983)). Perhaps for this reason, a number of our sister circuits have held that the value of the transferred property to the creditors has no relevance in determining whether the debtor acted with intent to hinder, delay, or defraud the creditors. *See Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281-82 (9th Cir. 1996) (depletion of assets not a prerequisite to denial of bankruptcy discharge when property transfer was made with intent to defraud creditors); *Davis*, 911 F.2d at 562; *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 569 (7th Cir. 1989) ("[S]o long as there is an *intent* to hinder, delay or defraud in combination with an act such as a transfer, then a debtor should be denied the privilege of discharge."). Today, we too so hold.

In this case, the evidence amply supports the bankruptcy court's finding that Smoot transferred the FELA proceeds to Glass Apple with the intent to hinder, delay, or defraud his creditors. In the context of § 548(a)(1)(A), courts closely scrutinize transfers between related parties. Indeed, such transfers, if made without adequate consideration, create a presumption of actual fraudulent intent. *See Hyman v. Porter (In re Porter)*, 37 B.R. 56, 60-61 (Bankr. E.D. Va. 1984); *see also Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989). This presumption establishes the trustee's prima facie case and shifts the burden of proof to the debtor to establish the *absence* of fraudulent intent. *See Porter*, 37 B.R. at 61. Here, Smoot transferred $210,000 of the proceeds from his settlement with CSX to Glass Apple, a corporation owned entirely by members of his immediate family, and received no consideration in exchange for this transfer. A transfer of this kind suffices to establish the presumption of fraudulent intent, *see Graven v. Fink (In re Graven)*, 936 F.2d 378, 383-84 (8th Cir. 1991), and Smoot offered no evidence to rebut this presumption. Thus, the bankruptcy court hardly erred in concluding that such trans-

fers were fraudulent and subject to avoidance by the bankruptcy trustee.

## III.

The bankruptcy court also held that the trustee could avoid the transfer and recover the transferred property on another ground. Specifically, the court held that, at the time Smoot transferred the funds, he was insolvent and he did not receive reasonably equivalent value in exchange for the transferred property. *See* 11 U.S.C. § 548(a)(1)(B) (the trustee may avoid any transfer of an interest of the debtor in property made within one year of the date of the filing of the petition, if the debtor (i) received less than a reasonably equivalent value in exchange for such transfer or obligation and (ii) was insolvent on the date that such transfer was made). We agree that § 548(a)(1)(B) provides an alternative, independent basis for avoiding the transfer.

Smoot argues to the contrary, asserting that he did receive reasonably equivalent value in exchange for the transfer of the settlement proceeds to Glass Apple. He maintains that he invested the settlement proceeds in Glass Apple in the hope of providing a continuing source of employment for himself and his family. But, indisputably, Smoot received nothing of material value — not stock, not a mortgage, not a promissory note — in exchange for the $210,000 that he transferred to the corporation. Moreover, because Smoot owned no Glass Apple stock, he did not benefit from any increase in the value of the corporation's stock that may have resulted from the transfer. Nor did the company execute an agreement promising to continue to employ Smoot in the future in exchange for the transferred funds. In sum, Glass Apple provided nothing to Smoot in exchange for the $210,000. Although Smoot's desire to provide for his family is commendable, courts have consistently held that a transfer motivated by love and affection does not constitute reasonably equivalent value for the purposes of 11 U.S.C. § 548. *See, e.g.*, *Porter*, 37 B.R. at 61. In sum, the bankruptcy court correctly concluded that Smoot did not receive equivalent value in exchange for the transfer of the $210,000.

Furthermore, the bankruptcy court also properly concluded that Smoot was insolvent when he transferred the funds.[2] At the time

---

[2]Courts generally rely upon the Bankruptcy Code's definition of insolvency for the purposes of § 548(a)(1)(B). *See Porter*, 37 B.R. at 61. Sec-

Smoot transferred the $210,000 to Glass Apple, the Ohio district court had found him liable to CSX and the Union for violations of the Federal Wiretapping Act, but had not yet determined the amount of damages. The bankruptcy court found that, even making the unlikely assumption that the Ohio court would award no damages in the wiretapping case, at the time of the transfer, Smoot's total assets amounted to $21,000 and his liabilities exceeded $40,000, thereby rendering him insolvent.[3] Smoot has failed to provide any evidence suggesting that the bankruptcy court's determination was erroneous, nor does the record reveal any such evidence. Thus, because Smoot, while insolvent, transferred $210,000 to Glass Apple without receiving any consideration in return, the trustee was entitled to avoid the transfer under § 548(a)(1)(B), as well as under § 548(a)(1)(A).

## IV.

Finally, having concluded that Smoot transferred the proceeds from the settlement agreement with CSX with the intent to defraud his creditors, we affirm the bankruptcy court's judgment denying Smoot a discharge in bankruptcy. *See* 11 U.S.C. § 727(a)(2)(A) (1994) (precluding the grant of a discharge in favor of a debtor if the debtor

---

tion 101(32) of the Bankruptcy Code provides that, for an individual, insolvent means:

> [A] financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of —
>
>> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
>>
>> (ii) property that may be exempted from property of the estate under section 522 of this title.

11 U.S.C. § 101(32) (1994). All liabilities must be considered in determining whether a debtor was insolvent at the time of the transfer in question. *Porter*, 37 B.R. at 61.

[3]For the purposes of the insolvency determination, we exclude the proceeds from the Settlement Agreement with CSX. *See* 11 U.S.C. § 101(32)(ii).

transferred property with the intent to defraud his creditors within one year of the date of filing a petition for bankruptcy).

In sum, because abundant evidence supports the bankruptcy court's findings of fact, and no error taints its legal conclusions, the judgment is, in all respects,

*AFFIRMED.*