BEAR, STEARNS SECURITIES
CORP., Plaintiff,

v.

Helen GREDD, Chapter 11 Trustee
for Manhattan Investment
Fund Ltd., Defendant.

No. 01 Civ. 4379(NRB).

United States District Court,
S.D. New York.

March 22, 2002.

Daniel E. Reynolds, Lankler, Siffert & Wohl, LLP, New York City, for trustee.

Daniel J. Kramer, Schulte, Roth & Zabel, LLP, New York City, for defendant.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, Bankruptcy Judge.

In a Memorandum and Order dated July 25, 2001, we granted Bear, Stearns Securities Corp.'s ("Bear, Stearns") motion to withdraw this matter from the United States Bankruptcy Court for the Southern District of New York pursuant to 28 U.S.C. § 157(d) in order to resolve sub-

stantial and material questions regarding the federal securities laws and the regulations issued thereunder. *See Bear, Stearns Sec. Corp. v. Gredd,* 2001 WL 840187, at *1 (S.D.N.Y. July 25, 2001). The specific issue which we found to require consideration of non-bankruptcy federal law was whether the proceeds generated from short sales of stock, and the securities later purchased to cover those short sales, constituted "interest[s] of the debtor in property" within the meaning of 11 U.S.C. § 548(a)(1)(A).

Now Bear, Stearns moves to dismiss Counts II and III of the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the reasons that follow, the motion is granted and the matter is remanded to the Bankruptcy Court for further proceedings.

## BACKGROUND[1]

Manhattan Investment Fund, Ltd. ("the Fund") was an off-shore investment company that traded United States securities from 1996 to 2000. The principal strategy of the Fund was to sell short technology and Internet-related securities that its manager, Michael Berger, believed to be overvalued. This strategy was a colossal failure, leading to the loss of approximately $394 million out of the approximately $410 million invested in the Fund. Unable or unwilling to admit his miscalculations, Mr. Berger issued false statements to investors that indicated that the Fund was profitable and, in order to maintain the charade, paid off early investors with funds acquired from later investors.[2] The scheme eventually unraveled, however, and Mr. Berger was charged with, and pleaded guilty to, violating § 10(b) of the Securities Exchange Act of 1934. *See United States v. Berger,* 188 F.Supp.2d 307, 338 (S.D.N.Y.2002) (denying motion to withdraw guilty plea). The S.E.C. appointed Helen Gredd as the Receiver for the Fund, and she filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Ms. Gredd was subsequently named Chapter 11 Trustee of the Fund. At about the same time, a class-action lawsuit against Mr. Berger, Bear, Stearns, and others was brought before Judge Denise Cote of this District. *See Cromer Fin. Ltd. v. Berger,* 205 F.R.D. 113, 119 (S.D.N.Y.2001) (granting motion for class certification). While the class action remains pending, Judge Cote has already granted Bear, Stearns's motion to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6). *Cromer,* 137 F.Supp.2d at 472.

Short sales,[3] such as those at issue here, require the assistance of a broker, and

---

1. As Bear, Stearns moves for dismissal under Rule 12(b)(6), we accept the factual allegations in the Complaint as true. *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). Furthermore, we discuss the factual background only briefly herein, as a more complete discussion is available in *Cromer Fin., Ltd. v. Berger,* 137 F.Supp.2d 452, 461–64 (S.D.N.Y.2001).

2. Such a business model is commonly called a "Ponzi" scheme, after Charles Ponzi, who is credited with inventing and implementing the scheme in 1919–20. *See generally Cunningham v. Brown,* 265 U.S. 1, 4, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (discussing the "remarkable criminal financial career of Charles Ponzi"); *Merrill v. Abbott (In re Indep. Clearing House Co.),* 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984) (collecting cases).

3. "A short sale is a speculative transaction where a security not owned by the seller is sold in the hope that the price of the security will decline, permitting the seller to later repurchase the security ('cover') and make a profit. Typically, the seller borrows the security to be sold short from his broker and covers by later buying the identical stock and transferring it to his broker." *Gredd,* 2001 WL 840187, at *1.

Bear, Stearns served as the "prime broker" to the Fund throughout its existence, financing all of its short sales. In the year prior to the Fund's bankruptcy filing, Bear, Stearns lent a large number of securities to the Fund, which were immediately sold on the market for $1.7 billion. *See* Compl.Ex. B. Because the price of many of these securities increased, the Fund was later forced to pay $1.9 billion in order to buy identical securities to remit its loans from Bear, Stearns. The Trustee admits, however, that these sums greatly exceed Bear, Stearns's actual revenues from financing the Fund's short sales which were only about $2.4 million. Compl. ¶ 30.

In this adversary proceeding, the Trustee seeks to recover, *inter alia,* the $1.7 billion (Count II) and the $1.9 billion (Count III) described in the previous paragraph, alleging that these amounts were transferred fraudulently by the Fund within one year of its bankruptcy petition.[4] *See* 11 U.S.C. § 548(a)(1)(A); *id.* § 546(e) (trustee may avoid margin or settlement payments only under § 548(a)(1)(A)). Bear, Stearns asserts that neither sum constitutes an "interest of the debtor in property" under § 548(a)(1)(A), and, accordingly, seeks dismissal of these two Counts.

## DISCUSSION

### I. Dismissal under Rule 12(b)(6)

In considering a motion to dismiss under Rule 12(b)(6), we are required to accept as true the factual assertions in the complaint and to construe all reasonable inferences in favor of the plaintiff. *Zinermon v.*

---

4. While the Complaint also seeks, in Count I, avoidance of $141.4 million in margin payments, *see* Compl. ¶¶ 71–77 (Count I), Bear, Stearns has not moved to dismiss this Count.

5. We assume, for purposes of the present motion, that the Fund's transfers to Bear,

*Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Charles W. v. Maul,* 214 F.3d 350, 356 (2d Cir.2000). In addition, we may grant the motion only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996).

### II. "An Interest of the Debtor in Property" Under Section 548(a)(1)(A)

Section 548(a)(1)(A) of the Bankruptcy Code provides:

> The trustee may avoid any transfer of *an interest of the debtor in property,* or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily [ ] made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

(emphasis supplied).

Bear, Stearns asserts that, for purposes of § 548(a)(1)(A), "an interest of the debtor in property" "refers to property that, but for the transfer, would have been available for the benefit of the debtor's creditors."[5] Def.'s Mem. at 13. The Trustee disagrees and argues that this "no harm, no foul" approach is misguided for two reasons. Pl.'s Mem. at 12. She asserts, first, that the language of § 548(a)(1)(A) "does not by its terms re-

Stearns were made with actual intent to defraud its other creditors. This assumption permits us to focus on Bear, Stearns's contention that § 548(a)(1)(A) has a "diminution of estate" requirement.

quire a showing of 'diminution of resources,'" and, second, that "to add such a requirement would render section 548(a)(1)(B)—the constructive fraud provision—superfluous." *Id.*[6]

Support for the Trustee's reading of § 548(a)(1)(A) may be found in several opinions. The Fourth Circuit, for example, has stated:

> Nothing in § 548 indicates that a trustee must establish that a fraudulent conveyance actually harmed a creditor.... Section 548 properly focuses on the intent of the debtor [rather than on the value of the transferred property to the other creditors], for if a debtor enters into a transaction with the express purpose of defrauding his creditors, his behavior should not be excused simply because, despite the debtor's best efforts, the transaction failed to harm any creditor.

*Tavenner v. Smoot,* 257 F.3d 401, 407 (4th Cir.2001);[7] *see also Brown v. Third National Bank (In re Sherman),* 67 F.3d 1348, 1355 n. 6 (8th Cir.1995) ("actual harm is not required; the trustee must show only that the debtor acted with the intent to hinder, delay or defraud creditors"); *Development Specialists Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.),* 250 B.R. 776, 793–94 (Bankr.S.D.Fla.2000) ("Under the plain language of

[§ 548(a)(1)(A)], the inquiry is not whether the ... other creditors were harmed by the [allegedly fraudulent transfer], but whether [the debtor] intended to hinder, delay or defraud its creditors when it made [the allegedly fraudulent transfer].... [I]f diminution of the estate were an essential element of a [§ 548(a)(1)(A)] claim, [§ 548(a)(1)(B)] would be redundant."); *Mather v. Clancy (In re Honey Creek Entertainment, Inc.),* 246 B.R. 671, 685 (Bankr.E.D.Okla.2000) (following *Krudy v. Scott (In re Scott),* 227 B.R. 834, 843 (Bankr.S.D.Ind.1998) (quoting *In re Sherman,* 67 F.3d at 1355 n. 6)).

Nevertheless, based on more substantial authority supporting Bear, Stearns's argument, as well as considerations of policy, we reject the Trustee's reading of § 548(a)(1)(A). We offer two primary reasons to read § 548(a)(1)(A) to permit a defendant to oppose an avoidance by the Trustee in this manner, one founded in text, the other in policy.

### A. Text

First and foremost, both the Supreme Court and Second Circuit have interpreted the identical statutory language—"an interest of the debtor in property"—in the manner advocated by Bear, Stearns. In *Begier,* the Supreme Court stated that "property of the debtor"[8] for purposes of

**6.** The Bankruptcy Code does not directly define "an interest of the debtor in property." *See Begier v. Internal Revenue Serv.,* 496 U.S. 53, 58, 59 n. 3, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

**7.** This language, however, is arguably dicta, because the *Smoot* Court indicated that the transference of the property at issue there—property that could be exempted from the bankruptcy estate under state law—actually may have harmed creditors:

> Under a statutory scheme in which all property is presumed to be part of the bankruptcy estate, and no property is exempt until

such time as the debtor claims an exemption for it, creditors *can* be harmed by transfers of potentially exempt property because it is not a foregone conclusion that such property will be exempt from the estate. Potentially exempt property can be used to satisfy the demands of the creditors if the debtor never claims the exemption.

257 F.3d at 407 (emphasis in original).

**8.** This language was replaced by statutory amendment to read "an interest of the debtor in property." The Supreme Court has held, however, that these two phrases have "coex-

the preferential transfer provision, § 547(b), is "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." 496 U.S. at 58, 110 S.Ct. 2258; *see Glinka v. Bank of Vt. (In re Kelton Motors, Inc.)*, 97 F.3d 22, 25 (2d Cir.1996) (quoting this language from *Begier*); *see also Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004, 1007 (9th Cir.2000) ("In order to determine whether property that is transferred belongs to the debtor for purposes of § 547, we apply the 'diminution of estate' doctrine.") (citing *Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries, Inc.)*, 16 F.3d 313, 316 (9th Cir. 1994)). While *Begier* and its progeny were concerned with § 547 rather than § 548, the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," counsels us to construe this language to have the same meaning when it is used in § 548(a)(1)(A). *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990) (internal quotation marks and citations omitted).

■ The Trustee counters that, while this reading of the relevant language may be appropriate for § 547, it is "not applicable to actions brought under the actual fraud provision," § 548(a)(1)(A). Pl.'s Mem. at 12. She asserts that "transfers which are shown to have been made with actual intent to hinder, delay or defraud creditors" are distinguishable from transfers which amount to a mere impermissible preference because they are "by their very nature harmful, and will much more often than not have also resulted in concrete economic harm." *Id.* at 14. We acknowledge that the purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the

estate itself for the benefit of all creditors. *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir.1991). We do not see, however, why this distinction should lead to giving identical language different meanings. Whether the goal is to protect some creditors, as in the case of § 547, or all creditors, as in the case of § 548, only asset transfers that may have actually harmed creditors may be avoided.

Moreover, numerous courts have extended the *Begier* Court's reading of "an interest of the debtor in property" to § 548. *See, e.g., Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 849 (6th Cir.2002); *Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 595–97 (5th Cir. 1996); *Pioneer Liquidating Corp. v. San Diego Trust & Sav. Bank (In re Consolidated Pioneer Mortgage Entities)*, 211 B.R. 704, 717 (S.D.Cal.1997) (*"Pioneer"*), aff'd in relevant part, 166 F.3d 342, 1999 WL 23156, at *1–*2 (9th Cir.1999); *Glosband v. Watts Detective Agency, Inc.*, 21 B.R. 963, 971 (D.Mass.1981) (construing predecessor statute to § 548); *see also Parker v. Saunders (In re Bakersfield Westar)*, 226 B.R. 227, 233 n. 12 (9th Cir. BAP 1998) (because the "language of § 548 parallels § 547, ... cases analyzing § 547 have been applied by courts interpreting § 548"). Moreover, a leading bankruptcy treatise impliedly concurs with the view of these courts. *See* 5 Collier on Bankruptcy ¶ 548.04(1) at 548–4 (Lawrence P. King, et al. eds., 15th ed. rev. vol.2001) (defining "fraudulent transfer" under § 548 as "an act which has the effect of improperly placing assets beyond the reach of creditors"). In short, we find strong textual support for Bear, Stearns's reading of the relevant statutory language.

tensive" meanings. *Begier,* 496 U.S. at 59 n. 3, 110 S.Ct. 2258.

## B. Policy

Second, the overarching purpose of the Bankruptcy Code is best fulfilled by adopting a definition of "an interest of the debtor in property" that requires the fraudulent transfer to have actually harmed at least one creditor. *See Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) (the purposes of the Bankruptcy Act "must ultimately govern" the definition of "property" under that statute). As we noted above, the purpose of § 548(a)(1)(A) is to prevent the debtor from "placing assets beyond the reach of creditors" by removing them from the estate with the intent to hinder, delay, or defraud his creditors. 5 Collier at 548–6–7; *see also, e.g., United States v. Sims (In re Feiler)*, 218 F.3d 948, 955 (9th Cir.2000) ("The purpose behind [ ] § 548 is to avoid fraud and self-dealing by a debtor at the expense of the estate's creditors."); *United Energy*, 944 F.2d at 597 ("the policy behind section 548 is to preserve the assets of the estate"). A transfer of property, even if made with fraudulent intent, that does not leave any creditor in a worse position than he would have been had the transfer never occurred, obviously does not offend the policy behind § 548(a)(1)(A).

■ Thus, in *Begier*, where the trustee sought avoidance of certain asset transfers based on the preferential transfer provision, § 547, the Supreme Court stated:

[I]f the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated.

\*\*\*

Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate—the property available for distribution to creditors—"property of the debtor" [9] ... is best understood as "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."

496 U.S. at 58, 110 S.Ct. 2258. Other courts have recognized that the purpose of § 548 also leads to the conclusion that creditors must actually be harmed in order to avoid a fraudulent transfer under that section. *See, e.q., Melamed v. Lake Cty. Nat'l Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984) (dismissing fraudulent transfer claim because the allegedly fraudulent transfer "did not diminish the assets of the debtor which were available to its creditors"); *Decker v. Advantage Fund Ltd. (In re JTS Corp.)*, No. 98–59752, slip op. at 6 (Bankr. N.D.Cal. May 22, 2001) ("the reach of § 548 [only] extends to transfers of assets that would otherwise be available to creditors"). In *Pioneer*, the Court concluded as follows:

Although there is no formal "diminution of estate" requirement in the statutory language [of § 548], the purpose of fraudulent transfer recovery is to prevent a debtor from putting assets otherwise available to its creditors out of their reach: "In our quest to understand fraudulent transfer liability, we often overlook first principles. At its core, fraudulent transfer law is a debt-collection device and not a revenue generating tool; its mission is to prevent the unjust diminution of the debtor's estate."

211 B.R. at 717–18 (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr.Dev.J. 55, 128 (1991)); *cf. Gould v. Levin (In the Matter of Credit Indus. Corp.)*, 366 F.2d 402, 407 (2d Cir.1966) ("Bankruptcy does not provide a forum for the realignment of

**9.** *See note 8, supra.*

rights or priorities but serves only as a forum for the recognition of rights already acquired."). We thus conclude that § 548(a)(1)(A) only permits a trustee to avoid a transfer of an interest of the debtor in property when, but for the transfer, such property interest would have been available to at least one of the debtor's creditors.

### C. Burdens

Much of the force of the Trustee's opposition to Bear, Stearns's proposed reading of § 548(a)(1)(A) comes from her concern that, if adopted, she (or any Trustee seeking avoidance under that statute) would be required to make an additional showing of "diminution of estate" as part of her prima facie case. Pl.'s Opp. at 6, 12. We are not unsympathetic to her concern, as a Trustee seeking to avoid a transfer under § 548(a)(1)(A) already bears the difficult burden of proving, *inter alia*, that the transfer was made with "actual intent" to defraud creditors. Accordingly, we decline to make "diminution of estate" an element of § 548(a)(1)(A).

■ Rather, when a transferee makes an argument, supported by appropriate evidence, that the transferred assets were never available to any creditors by operation of federal law, and, therefore, the creditors suffered no harm, the transferee will bear both the ultimate burden of proof as well as the initial burden of production on this issue. *Cf.* 5 Collier at 548–25 ("The burden of showing a harmless effect when the fraudulent intent is made out surely belongs on the defendant in a proceeding by the trustee under section 548(a)(1)(A)."). Specifically, the transferee must demonstrate to the satisfaction of the court that the transfer did not (1) reduce

the res that would have been available to any creditor or creditors, (2) "hinder, delay, or defraud" any creditor or creditors, nor (3) have any other adverse impact on any creditor or creditors generally.[10] 11 U.S.C. § 548(a)(1)(A). If he succeeds in so demonstrating, which we expect will be rarely, the burden shifts to the trustee to rebut the transferee's showing. *Id.* Whether the transferee has sustained his ultimate burden of proof will be decided on the entire record before the court.

### III. The Transfers at Issue

■ We now apply the burden-shifting analysis discussed above, *see* Part II.C, *supra,* to the transfers at issue here. Bear, Stearns asserts that the $1.7 billion sought in Count II and the $1.9 billion sought in Count III were never available to the Fund's creditors by operation of the federal securities laws. For the reasons that follow, we find that Bear, Stearns has met both their initial and ultimate burdens, and therefore dismiss Counts II and III.

### A. Bear, Stearns's Showing of No Harm to Creditors

Bear, Stearns has convincingly demonstrated that neither the $1.7 nor $1.9 billion sought by the Trustee would have been available to satisfy the Fund's creditors but for the Fund's transfers to Bear, Stearns itself. Bear, Stearns's argument is properly founded on the operation of the federal securities laws.

"Short sales . . . are the subject of complex and quite technical federal regulation." *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 705 (2d Cir.1998), *cert. denied,* 525 U.S. 1144, 119 S.Ct. 1039, 143 L.Ed.2d

---

**10.** The court should assume, for purposes of this showing, that the transfer at issue was made with actual fraudulent intent.

47 (1999). "Regulation T," which regulates extensions of credit by brokers and dealers, was issued by the Board of the Federal Reserve System pursuant to its authority under the Securities Exchange Act of 1934. *See* 12 C.F.R. § 220.1 (Regulation T). Regulation T requires that customers maintain a margin account with their broker that contains, at all times, funds equivalent to 150% of the current market value of the securities [11] sold short. 12 C.F.R. § 220.12(c)(1); *see also Levitin,* 159 F.3d at 701; Federal Reserve Staff Opinion, Aug. 28, 1981, F.R.R.S. 5–693.2. Thus, as the Second Circuit has made clear, "any proceeds from the [short] sale are *frozen* under [Regulation T] until the seller covers the short sale." *United States v. Russo,* 74 F.3d 1383, 1388 (2d Cir.1996), *cert. denied,* 519 U.S. 927, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996) (emphasis supplied). Moreover, even when the short seller covers some of his short sales, the broker may only release these frozen funds to the extent that the customer's account balance exceeds the margin requirements established by Regulation T. *See* Federal Reserve Staff Opinion, Nov. 21, 1979, F.R.R.S. 5–693.

Regulation T thus mandated that 150% of the current market value of the securities borrowed by the Fund from Bear, Stearns, which fluctuated from $1.7 billion (the value at time of the short sales) to $1.9 billion (the value at the time of the covers), remain frozen and in the control of Bear, Stearns so that it would be available to repay Bear, Stearns's loan. *Cf. Berger,* 137 F.Supp.2d at 472 (Regulation T's "margin regulations [ ] are designed to protect the viability of brokerage houses"). Therefore, by operation of federal law, these funds were never available to satisfy

any obligations of the Fund apart from its obligation to cover the short sales and repay Bear, Stearns. Bear, Stearns has, accordingly, satisfied its initial burden of showing that neither the $1.7 nor $1.9 billion would have been available to satisfy the Fund's other creditors but for the (assumed) fraudulent transfer. The burden now shifts to the Trustee to rebut this showing.

## B. The Trustee's Rebuttal

The Trustee argues that "this is not a case of 'no harm, no foul.'" Pl.'s Mem. at 12. Her argument is as follows:

> The transfers at issue here were a necessary part of a plan to enable the Fund to engage in short selling while concealing from the Fund's general body of creditors [its investors] the nature and results of that short selling and the Fund's deteriorating financial condition. As the Complaint alleges, and as Bear[,] Stearns['s] own arguments simply confirm, the Fund could not have continued short selling without making the transfers at issue. And had the Fund not continued its short selling, it would not have been required to use several hundred million dollars obtained from other creditors to pay off its stock loans to Bear Stearns. As a result, it is manifestly not the case that the Fund's other creditors are no worse off economically than if the transfers at issue had not been made.

Pl.'s Mem. at 16; *see Pioneer,* 211 B.R. at 717–18 (rejecting a similar argument). In advancing this argument, the Trustee is, in essence, seeking an end-run around the *Berger* decision, in which Judge Cote dismissed claims by the Fund's investors that Bear, Stearns breached a fiduciary duty to

---

**11.** Some types of securities are exempt from this rule, but neither side argues and there is no indication in the record that any of the securities traded by the Fund were "exempted securities" for purposes of Regulation T.

them and aided and abetted Berger's fraud by financing the Fund's short selling. 137 F.Supp.2d at 469–72. The *Berger* Court found that Bear, Stearns owed no fiduciary duty to the Fund's investors to disclose Berger's fraud, and that Bear, Stearns's actions constituted neither "substantial assistance" nor "knowing participation" in the fraud, as required by New York's aiding and abetting fraud law. *Id.* at 470–72. Accordingly, the Court found that the plaintiffs failed to state a claim against Bear, Stearns and granted the latter's motion to dismiss all claims against it. *Id.* at 472. We decline to entertain this oblique assault on the *Berger* decision.

Moreover, the Trustee does not even attempt to oppose Bear, Stearns's argument that the federal securities laws mandate that the sums sought in Counts II and III be transferred only to Bear, Stearns, and thus were never available to satisfy the claims of any other creditors.[12] We therefore find that the Trustee has failed to rebut Bear, Stearns showing that the transfers at issue here did not harm a single creditor.[13]

### C. The Transfers at Issue Were Not Transfers of "An Interest of the Debtor in Property"

Upon due consideration of all arguments and evidence put forth by both sides, we conclude that the transfers sought to be avoided were not transfers of "an interest of [the Fund] in property" because the federal securities laws do not permit non-brokerage house creditors to recover the transferred assets.

The margin requirements contained in Regulation T are, as we discussed above, designed to protect brokerage houses by guaranteeing that their loans to short sellers are repaid. This protection, in turn, permits brokerage houses to serve an important function for our securities markets by "standing behind" trades. Well-capitalized brokers such as Bear, Stearns provide the often large amounts of cash and securities needed to complete securities transactions, thus permitting the securities market to function efficiently. *See* Henry F. Minnerop, The Role and Regulation of Clearing Brokers, 48 Bus.Law. 841, 841 (1993) ("Without the availability of the capital, technology, and expertise of clearing brokers, the smooth and reliable functioning of modern securities markets ... would be impossible.").

If we were to accept the Trustee's arguments presented here, it would be riskier for brokers to stand behind customer trades and their protectively reactive actions would, no doubt, impair the efficiency of our securities markets. We are therefore hesitant to order Bear, Stearns to disgorge billions of dollars as the Trustee requests. *Cf. Gleason v. Thaw*, 236 U.S. 558, 560, 35 S.Ct. 287, 59 L.Ed. 717 (1915) ("the bankrupt law is a prosy thing, intended for ready application to the everyday affairs of practical business"). We

---

**12.** Rather, she asserts that Bear, Stearns is "inviting this Court to overrule Congress and judicially repeal section 546(e) of the Bankruptcy Code, which expressly authorizes a Trustee to avoid margin and settlement payments made with actual intent to defraud." Pl.'s Mem. at 19. While the Trustee is clearly correct that § 546(e) provides the authority to avoid some margin and settlement payments, it is equally clear that § 546(e) only authorizes avoidance of transfers that fall within the boundaries established by § 548(a)(1)(A)—those transfers that actually harm at least one creditor.

**13.** We consider, finally, the Trustee's argument that New York property law is the proper focus of our analysis. *See* Pl.'s Mem. at 9. In *Butner v. United States*, the Supreme Court held that "[p]roperty interests are created and defined by state law [u]nless some federal interest requires a different result." 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). We find that this is such a case.

note, finally, that this result harmonizes with the overall goals of both federal bankruptcy and securities law. Thus, for all the reasons discussed above, the Trustee's arguments, though imaginative and novel, ultimately fail.

### CONCLUSION

For the reasons discussed herein, we grant Bear, Stearns's motion to dismiss Counts II and III of the Trustee's Complaint. The reference to the United States Bankruptcy Court for the Southern District of New York is hereby reinstated, and the action is remanded for further proceedings.

IT IS SO ORDERED.