In re MANHATTAN INVESTMENT
FUND LTD., et al., Debtors.

Helen Gredd, Chapter 11 Trustee
for Manhattan Investment
Fund Ltd., Plaintiff,

v.

Bear, Stearns Securities
Corp., Defendant.

Bankruptcy Nos. 00–10922(BRL),
00–10921.
Adversary No. 01–2606.

United States Bankruptcy Court,
S.D. New York.

Oct. 7, 2002.

**502**

Lankler, Siffert & Wohl by Helen Gredd, Daniel Reynolds, David Diamond, New York, NY, for Plaintiff, Chapter 11 Trustee.

Schulte, Roth & Zabel LLP, by Harry S. Davis, Michael L. Cook, Daniel J. Kramer, New York, NY, for Defendant, Bear, Stearns Securities Corp.

### MEMORANDUM DECISION & ORDER DENYING MOTION TO DISMISS COMPLAINT

BURTON R. LIFLAND, Bankruptcy Judge.

This adversary proceeding is an outgrowth of a massive fraudulent Ponzi scheme perpetrated by Michael Berger, a convicted felon and fugitive. As set forth below, three United States District Court Judges, this Court, the Supreme Court of Bermuda, and the High Court of Justice of the British Virgin Islands have been called upon to parse out the sequela of the Manhattan Investment Fund (the "Fund" or the "Debtor") Ponzi scheme. The chapter 11 Trustee appointed in this case, (the "Trustee"), has filed a complaint against Bear, Stearns Securities Corp. ("Bear Stearns" or the "Defendant") seeking to avoid certain transfers made by the Debtor. Count I of the complaint seeks to avoid $141.4 million in margin payments made to Bear Stearns, while Count IV seeks equitable subordination of any claim that Bear Stearns may assert against the estate. Bear Stearns now moves to dismiss Counts I and IV of the complaint.

### Background

The Fund, which traded securities from April 1996 through January 2000, was an off-shore hedge fund whose strategy was to short sell United States securities of technology companies on the theory that the companies were overvalued and their stock prices would decline in value.[1] Michael Berger served as the investment manager and advisor for the Fund through his wholly-owned company, Manhattan Capital Management, Inc. ("MCM"). Rather than declining in value, the securities that Berger sold short during this period increased in value, causing the Fund to buy identical securities to cover, at a dramatically higher price. *See Bear Stearns Securities Corp. v. Helen Gredd, Chapter 11 Trustee for Manhattan Investment Fund, Ltd.,* 275 B.R. 190, 192 (S.D.N.Y.2002). Ultimately, the losses sustained by the Fund from such short selling totaled approximately $410 million. *See id.* at 191.

---

1. A short sale is a sale of a security that the seller does not own. Instead, the seller (in this case, the Fund) borrows the security from a third party to sell to a buyer, in the hope that the price of the security will decline. If the price of the security declines, the short seller can realize a profit by purchasing the same security in the open market at a lower price and later transferring it to the broker-lender, thus repaying the loan, or "covering" the short sale. Short selling is a speculative transaction which ultimately proved to be devastatingly unsuccessful for the Fund, whose hidden losses were in excess of $275 million at the beginning of the Count I period and ultimately grew to more than $400 million at the end of the period.

Bear Stearns served as the prime broker to the Fund throughout its existence, financing all of its short sales by lending the Fund the securities Berger wished to sell short. At the Fund's inception, Berger opened an account in the Fund's name with the Bank of Bermuda as a depository for new investor monies. Money deposited into this account was allegedly transferred to the Fund's margin account at Bear Stearns almost every month. In addition, the Fund's account statements were prepared by Bear Stearns. According to Bear Stearns' monthly account statements and daily trading reports, Berger began losing money on a regular basis from the Fund's inception. Although Bear Stearns maintained accurate records of the Fund's trading which reflected these losses, Berger created false account statements that he distributed to his investors and various service providers (other than Bear Stearns). Rather than revealing the losses incurred by the Fund, those statements showed nonexistent gains. In order to maintain this scheme, the Fund paid off early investors from funds subsequently acquired from later investors. Such a scheme is commonly referred to as a Ponzi scheme.

Berger's scheme began to unravel in January 2000, when Deloitte and Touche, LLP withdrew its audit reports for the years ending December 31, 1996, 1997 and 1998. On January 14, 2000, following an investigation, the Securities and Exchange Commission (the "SEC"), filed a lawsuit alleging securities fraud against the Fund, MCM and Berger. The SEC obtained an asset freeze and the appointment of Helen Gredd as Receiver for the Fund. After confessing that he lied about the Fund's performance, Berger pled guilty to securities fraud in a parallel criminal proceeding.[2] On March 7, 2000, the Receiver caused the Fund to file a voluntary petition for relief under chapter 11 of title 11, United States Bankruptcy Code (the "Bankruptcy Code"), and on April 4, 2000, the Receiver was appointed chapter 11 Trustee of the Fund. At about the same time, a class-action lawsuit was commenced by certain of the Fund's investors against Berger, Bear Stearns and others before Judge Cote in the United States District Court for the Southern District of New York, (the "District Court"). *See Cromer Finance Ltd. v. Berger*, 137 F.Supp.2d 452 (S.D.N.Y.2001). The Trustee was not a party to that action.

On April 24, 2000, the Trustee commenced this adversary proceeding against Bear Stearns. In her complaint, the Trustee sought to avoid, pursuant to section 548(a)(1)(A) of the Bankruptcy Code, three categories of transfers that were made to Bear Stearns in connection with the Fund's short selling activities during the last ten months of its operations. Count I of the complaint seeks to avoid $141.4 million in margin payments which Berger caused to be transferred to Bear Stearns from the Fund's account with the Bank of Bermuda. Count II of the complaint sought to recover approximately $1.7 billion in short sale proceeds generated by the sale of stock that the Fund borrowed from Bear Stearns. Those proceeds were transferred to Bear Stearns to serve as part of the margin payments for the stock loaned to the Fund by Bear Stearns.

---

**2.** Berger subsequently sought, unsuccessfully, to withdraw his guilty plea before Judge Marrero. *United States v. Berger*, 188 F.Supp.2d 307 (S.D.N.Y.2002). Berger also sought, again unsuccessfully, to oppose the SEC's motion for summary judgment in its suit pending against him before Judge Cote. *Securities and Exchange Commission v. Berger*, 2001 WL 34070098 (S.D.N.Y. Nov.13, 2001). On March 1, 2002, Berger failed to appear at his sentencing and remains a fugitive.

Count III of the complaint sought to recover approximately $1.9 billion worth of securities that were purchased with the short sale proceeds (plus other monies in the Fund's margin account), that were delivered to Bear Stearns to cover stock loans to the Fund. Count IV of the complaint seeks equitable subordination of any claim Bear Stearns may assert in the Fund's chapter 11 case to all other claims.

In May 2001, Bear Stearns moved to withdraw the adversary proceeding from this Court to the District Court. On July 25, 2002, the District Court granted Bear Stearns' motion to withdraw the reference for the limited purpose of determining whether the Debtor had an interest in the alleged transfers subject to Counts II and III of the complaint. *Bear Stearns v. Gredd*, 275 B.R. at 191; *Bear Stearns v. Gredd*, 2001 WL 840187 at *3,*4 ("specific issue which [the District Court] found to require consideration of non-bankruptcy federal law was whether the proceeds generated from short sales of stock, and the securities later purchased to cover those short sales, constituted 'interests of the debtor in property' within the meaning of 11 U.S.C. § 548(a)(1)(A)."). Bear Stearns then moved before the District Court to dismiss Counts II and III of the complaint. The District Court granted the motion to dismiss Counts II and III finding that the transfers sought to be avoided were not transfers of property in which the Fund had an interest. *See Bear Stearns v. Gredd*, 275 B.R. at 198. The District Court then reinstated the reference and remanded the remaining Counts I and IV to this Court for further proceedings. Bear Stearns now moves to dismiss the remaining Counts I and IV.

The Defendant moves to dismiss Count I on a variety of grounds. Bear Stearns argues that the Trustee has failed to plead, and cannot otherwise demonstrate the fraudulent nature of the alleged transfers—the margin payments. Bear Stearns also argues that the Trustee's claim is premised on an "aiding and abetting" argument that the District Court rejected in dismissing Counts II and III. Thus, Bear Stearns asserts that the doctrine of the law of the case now precludes the Trustee from asserting that argument in furtherance of Count I. Bear Stearns contends that in the absence of the aiding and abetting theory, there are no other allegations in the complaint that the margin payments were made with actual intent to hinder, delay or defraud the Fund's creditors, as required under section 548(a)(1)(A) of the Bankruptcy Code. Bear Stearns further argues that Count I should be dismissed because the Trustee has not alleged that the transfers actually harmed creditors of the Debtor's estate by reducing assets that otherwise would have been available to creditors. Finally, Bear Stearns argues that Count I should be dismissed as a matter of public policy. Bear Stearns asserts that Count IV of the complaint, which seeks equitable subordination of any claim that Bear Stearns may file in the future, should be dismissed because Bear Stearns has not yet filed a proof of claim against the estate.

### Discussion

Rule 12(b)(6) of the Federal Rules of Civil Procedure, (the "Rules"), which is made applicable to this proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), enables a defendant to move to dismiss a complaint on the ground that it fails to state a claim upon which relief may be granted. Fed.R. Civ.P. 12(b)(6); Fed.R. Bankr.P. 7012(b). "In reviewing a motion to dismiss, a court merely assesses the legal feasibility of the complaint, and does not weigh the evidence that may be offered at trial." *In re Churchill Mortg.*

*Inv. Corp.*, 256 B.R. 664 (Bankr.S.D.N.Y. 2000). A motion to dismiss must be denied unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All well-pled factual allegations must be read by the court as true, *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir.1994), and construed in a light most favorable to the plaintiff. *Conley v. Gibson*, 355 U.S. at 47, 78 S.Ct. 99; *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40,44 (2d Cir.1991); *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). The issue is not whether the Trustee ultimately will prevail on the merits, but whether she is entitled to offer evidence to support her claims. *In re Adler, Coleman Clearing Corp.*, 218 B.R. 689, 696 (Bankr.S.D.N.Y. 1998) (*citing Scheuer v. Rhodes*, 416 U.S at 236, 94 S.Ct. 1683). It is essential in resolving a motion to dismiss to focus precisely on the issue being asserted in the complaint.

### Fraudulent Nature of the Transfers

■ Section 546(e) of the Bankruptcy Code provides that the trustee may only avoid margin payments pursuant to section 548(a)(1)(A) of the Bankruptcy Code. 11 U.S.C. § 546(e). Section 548(a)(1)(A) provides that a trustee may avoid any transfer of an interest of the debtor in property that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily made

such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. 11 U.S.C. § 548(a)(1)(A). Section 548(a)(1)(A) has been referred to as the "actual fraud" avoidance provision because of its intent requirement. *See Frierdich v. Mottaz*, 294 F.3d 864 (7th Cir.2002). The operative requirement for a transfer to be avoided under this section is the *debtor's* actual fraudulent intent. Moreover, Bankruptcy Rule 7009(b) requires all assertions of fraud to be stated in a complaint with particularity. Fed. R. Bankr.P. 7009(b). Allegations of fraud may not be made upon information and belief unless the facts are peculiarly within the opposing party's knowledge. *In re Kanaley*, 241 B.R. 795 (Bankr.S.D.N.Y.1999); *In re Castillo*, 7 B.R. 135, 138 (Bankr.S.D.N.Y.1980).

■ Bankruptcy courts take a liberal approach in construing allegations of actual fraud pled by a trustee, because the trustee is a third party outsider to the transaction and must plead fraud based upon second hand knowledge. *See In re Everfresh Beverages, Inc.*, 238 B.R. 558 (Bankr.S.D.N.Y.1999), *accord In re Collins*, 137 B.R. 754, 755 (Bankr.E.D.Ark. 1992). Given the difficulties in establishing a transferor's actual intent, courts often look at the totality of the circumstances as well as the badges of fraud surrounding the transfers.[3] *See MFS/Sun Life Trust–High Yield Series v. Van Du-*

---

**3.** Badges of fraud are circumstances that so commonly accompany fraudulent transfers that their presence gives rise to an inference of intent to defraud. *See id.* at 935. Accordingly, courts look for (1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) *the transferor's knowledge of any other creditor's claims and the debtor's inability to pay them;* (5) use of dummies or fictitious parties; and (6) retention of control by the transferor after the conveyance. *See id.* (*emphasis added*).

*sen Airport Services, Co.,* 910 F.Supp. 913 (S.D.N.Y.1995).

█ The Trustee currently seeks to avoid margin payments that Berger made to Bear Stearns within one year of the Petition Date. Neither party disputes that the margin payments enabled the Fund to continue operating. In order for the Fund to continue its short selling activities, federal securities regulations required the Fund to maintain a margin account at a specified level with Bear Stearns. The issue currently before the Court is whether the Trustee has adequately pled that Berger made the subject margin payments to Bear Stearns with actual intent to hinder, delay or defraud the Fund's other creditors. The Trustee asserts that she has adequately pled Berger's actual fraudulent intent because all transfers made by a debtor during an ongoing Ponzi scheme are presumptively made with actual intent to hinder, delay or defraud creditors pursuant to section 548(a)(1)(A). Bear Stearns, on the other hand, argues that the fact that a debtor is engaged in a Ponzi scheme does not render the transaction as one presumed to have been made by the debtor with actual intent to defraud unless the transferee somehow participated in the scheme. Bear Stearns asserts that fraudulent intent is presumed only when the payments sought to be avoided are made to early investors in the Ponzi scheme. Moreover, Bear Stearns argues that the presumption of fraudulent intent is inapplicable if the transfers were made pursuant to a legitimate business transaction. Particularly, Bear Stearns asserts that despite the fact that Berger was operating a massive fraud and Ponzi scheme, Berger's actual practice of short selling technology stocks was a legitimate business practice—separate from the Ponzi scheme. Accordingly, Bear Stearns contends that the margin payments were made in connection with the Fund's short selling, a legitimate operation, and therefore outside the scope of the Ponzi scheme.

Several cases hold that transfers made by a debtor operating a Ponzi scheme are presumed to have been made with the requisite fraudulent intent required by section 548(a)(1)(A). One such case is *Merrill v. Abbott (In re Independent Clearing House Co.),* 77 B.R. 843 (D.Utah 1987). In *Independent Clearing House,* the debtor operated clearinghouse services whereby it solicited private investors and purported to use the funds received to assume and pay, at a discount, the accounts payable of the debtor's affiliate, ASC. *See id.* at 848. However, the debtor's operation was merely a Ponzi scheme, as ASC had no clients, and accordingly, no receivables. *See id.* Instead, later investors supplied the money to pay "earnings" and repay principal of the earlier investors. *See id.* Subsequently, the chapter 7 trustee sought to avoid payments that the debtor had made to its earlier investors, pursuant to section 548(a)(1)(A). *See id.* at 849. The bankruptcy court granted the trustee's motion for summary judgment. *See id.* In affirming the lower court on appeal, the district court concluded that "if at the time the debtors made transfers to earlier undertakers they had the actual intent to hinder, delay or defraud later undertakers, transfers to earlier undertakers may be fraudulent within the meaning of section 548(a)(1)." *Id.* at 860. The court went on to provide that:

One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new

investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law.

*Id.* Accordingly, the court noted that although the question of the debtors' intent would ordinarily present a factual question, where the debtors were engaged in a Ponzi scheme, the only possible inference is that the debtors had the intent to hinder, delay or defraud future creditors, because they must have known that future creditors would not be paid. *See id.* at 860. Thus, the court presumed the debtor's intent to defraud future creditors from the mere fact that the debtor was operating a Ponzi scheme.

In *Emerson v. Maples (In re Mark Benskin & Co., Inc.),* the debtor had been engaged in a Ponzi scheme whereby it used funds from subsequent investors to pay illusory profits to earlier investors. 161 B.R. 644, 647 (Bankr.W.D.Tenn.1993), *aff'd,* 1995 WL 381741, 1995 U.S.App. LEXIS 16053 (6th Cir. June 26, 1995). Eventually, the debtor corporation and its principal pled guilty to a multi-count federal indictment. *See id.* Thereafter, the chapter 7 trustee sought to avoid pursuant to section 548(a)(1)(A), money that the debtor had paid to an earlier investor. Like the court in *Independent Clearing House Co.,* the *Benskin* court ultimately concluded that the trustee had met his burden of proof that the transfers were made with actual intent to hinder, delay or defraud other creditors because the principal's knowledge when it made the transfers at issue, that there were insufficient assets to satisfy other creditors, coupled with the guilty pleas to the related criminal charges, sufficiently established the debtors' intent to defraud creditors for purposes of section 548(a)(1)(A). *See id.* at 648, 649.[4]

Nonetheless, Bear Stearns maintains that the mere acceptance of margin payments needed to permit the Fund to continue its short selling does not give rise to a claim for actual intent fraudulent transfer under section 548(a)(1)(A) unless Bear Stearns is alleged to have participated in the fraud. Bear Stearns refers this court to the recent case of *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.),* 281 B.R. 506 (Bankr. E.D.N.Y.2002).[5] *Sharp Int'l Corp.* involved three brothers (the "Spitz Brothers"), engaged in the business of importing, assembling and distributing wrist watches, clocks, pens and pencils. The Spitz Brothers sought investors for their business. However, in addition to reporting fictitious revenues in order to raise large amounts of cash from lenders and investors, the Spitz Brothers diverted over $44 million of Sharp funds to various companies they controlled. *See id.* at 510. State Street Bank & Trust Co. ("State Street") was Sharp's secured lender. *See id.* at 509. According to the complaint in that

---

**4.** Although the Court noted that regardless of the fact that neither party denied the debtors' fraudulent intent in that case, "there can be no doubt of it." *Id.* at 650. "The statutory language makes it plain that one can infer an intent to defraud from the mere fact that Debtors were operating a Ponzi scheme." *Id.* (citing *Rafoth v. First Nat'l Bank of Barnesville (In re Baker & Getty Financial Services, Inc.),* 98 B.R. 300, 308 (Bankr.N.D.Ohio 1989)).

**5.** This case currently is on appeal and came to the attention of the parties subsequent to the pre-argument briefing schedule. The case is the subject of post-argument briefs analyzing both this case and another recently decided case, *Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods),* 280 B.R. 103 (Bankr.E.D.Pa.2002).

case, upon discovering Sharp's fraud, State Street demanded that Sharp "secure new financing from investors who were unaware of the fraud, and use that financing to pay off the State Street debt." *Id.* at 511. Sharp then sold $25 million in subordinated notes to unsuspecting investors and used the proceeds of that sale to significantly pay down the State Street debt. *See id.* at 512. Following the filing of an involuntary chapter 11 petition, the debtor-in-possession commenced an adversary proceeding to recover the transfers that paid down the State Street debt, pursuant to New York Debtor and Creditor Law ("NY D & CL") section 276.

Pursuant to section 276 of the N.Y. D & CL, the debtor-in-possession asserted that Sharp made the payment to State Street with actual intent to hinder, delay or defraud its other creditors on grounds that the payments perpetuated the other creditors' ignorance of the Spitzes' breaches of their fiduciary duties to Sharp. *See id.* at 521. However, the court ultimately held that the debtor-in-possession failed to state a claim for intentional fraudulent conveyance because "Sharp's payment to State Street did not adversely affect Sharp's financial condition or its ability to repay its other creditors, since it merely substituted Sharp's obligation to the Noteholders for its obligation to State Street." *Id.* at 522. Moreover, the court concluded that "[a] transferee's acceptance of a payment, even with knowledge that the funds were obtained by fraudulent means, does not give rise to a claim of fraudulent conveyance if the transferee did not participate in the fraud." *Id.* at 522, 523. Accordingly, the court noted that "[a]lthough Sharp may have defrauded the Noteholders, it is difficult to see how the payment could be said to have facilitated or furthered that fraud." *Id.* at 523. Thus, the court concluded that Sharp had not alleged any act by the transferee that constituted

participation in the fraud. *See id.* at 523. However, to the extent that *In re Sharp Int'l Corp.* relied on N.Y. D & CL section 276, it is inapplicable to the present case. Under N.Y. D & CL section 276, a cause of action must allege fraudulent intent on the part of the transferor as well as the *transferee. See Sullivan v. Messer (In re Corcoran),* 246 B.R. 152, 161 (E.D.N.Y.2000) (*emphasis added*); *Gentry v. Kovler (In re Kovler),* 249 B.R. 238, 243 (Bankr. S.D.N.Y.2000) (holding that N.Y. D & CL requires "mutual fraudulent intention on the part of *both parties to the transaction*") (*emphasis added*). "Fraudulent intent on the part of one of the parties is insufficient." *In re Kovler,* 249 B.R. at 243. Accordingly, although N.Y. D & CL section 276 requires a showing that "the transferee must have participated or acquiesced in the transferor's fraudulent act," *id.,* section 548(a)(1)(A) contains no such requirement. Instead, section 548(c) designates the transferee's good faith as an *affirmative defense* which may be raised and proved by the transferee at trial. *See* 11 U.S.C. § 548(c) (*emphasis added*). Accordingly, to the extent that the *Sharp* court concluded that the Trustee failed to state a fraudulent conveyance claim on grounds that the transferee did not participate in the fraud, the holding in *Sharp Int'l Corp.* is inapplicable to this case. Furthermore, to the extent that the Defendant urges that the *Sharp* court's "transferee's participation holding" be construed as a general section 548(a)(1)(A) requirement, I suggest it is an incorrect interpretation.

Moreover, the factors that the *Sharp* court found dispositive in ruling that intent to defraud had not adequately been pled—namely, that the fraud was not ongoing when the transfer was made, and that the transfer did not adversely affect the debtor's ability to repay its other creditors—

are not present here. First, in this case, the Fund's Ponzi scheme was ongoing at the time the subject transfers were made. The Fund's hidden losses were in excess of $275 million at the beginning of the period in question and grew to more than $400 million by the end of that period. Moreover, the Trustee has alleged that the transfers subject to Count I clearly affected the Fund's financial condition, by asserting that the margin payments allowed Berger to continue his short-selling activities, thereby further depleting a pool of assets that otherwise would have been available for distribution to the Fund's other creditors. *See* Trustee's Complaint at ¶¶ 3,4.[6] The Trustee further asserts that if Bear Stearns had not accepted the margin payments, and declined to extend further credit to the Fund, which was consistently hemorrhaging enormous sums, Berger simply would not have been able to continue his short-selling activities. Instead, to the extent that the margin payments gave the Fund the ability to borrow additional securities from Bear Stearns, the Trustee asserts that the transfers had the effect of increasing, rather than decreasing, the Fund's total debt, thereby affecting other creditors. Accordingly, not only are the facts in the present case distinguishable from those in *In re Sharp Int'l Corp.*, but *In re Sharp Int'l Corp.* is further distinguishable from the present case in that it applies N.Y. D & CL section 276, which requires a showing of the *transferee's* intent in determining a cause of action for a fraudulent conveyance. *See*

*In re Corcoran*, 246 B.R. at 161 (*emphasis added*).

The Defendant also contends that the debtor's fraudulent intent is presumed only in cases involving payments to early investors with funds received from subsequent investors, because such payments indicate the perpetrator of the Ponzi scheme's knowledge that the payments will further diminish a decreasing pool of funds, and ultimately guarantee that there will be no money left to pay investors at the end of the line. Bear Stearns further asserts that *Independent Clearing House Co.* and *Mark Benskin & Co., Inc.* do not apply to the present case, because those cases involved a scheme in which new investor monies were used *exclusively* to pay earlier investors and there were no genuine business operations. Bear Stearns asserts that a classic Ponzi scheme is destined to collapse because it has no real business at its core. Accordingly, Bear Stearns urges that the presumption of the debtor's fraudulent intent is limited to cases where the debtor has no legitimate operations. I disagree.

■ When a debtor operating a Ponzi scheme makes a payment with the knowledge that future creditors will not be paid, that payment is presumed to have been made with actual intent to hinder, delay or defraud other creditors—regardless of whether the payments were made to early investors, or whether the debtor was engaged in a strictly classic Ponzi scheme. *See Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 230 B.R. 546 (Bankr.

---

**6.** Specifically, the Trustee asserted in her Complaint that during the course of 1999, Bear Stearns financed more than $2.2 billion in short sales for the Fund. *See id.* at ¶ 3. Despite the fact that Bear Stearns records showed the Fund to be down nearly 1700% for the year, and a Bear Stearns executive had expressly acknowledged that Berger might be operating a Ponzi scheme, Bear Stearns not only continued to do business with Berger's Fund, but substantially increased that business. *See id.* at ¶ 4. Moreover, the Trustee asserts that the surge in short selling, due to Bear Stearns' continued financing, accelerated the Fund's downward spiral to a loss of more than 2500% for the year. *See id.* at ¶ 5.

W.D.Tenn.1999) *rev'd on other grounds,* No. 99–2605 G/A (W.D.Tenn.2000), *aff'd* 277 F.3d 838 (6th Cir.2002). In *Cannon,* the debtor was a former attorney who specialized in real estate closings. *See id.* at 588. As a closing attorney, the debtor maintained several client escrow accounts to hold client funds in connection with real estate transactions. *See id.* However, the attorney used client funds in escrow to fund some of his personal business ventures. By the time the escrow funds reflected a $1.5 million deficiency, the debtor attempted to conceal the deficiency by paying off closings for prior accounts with money he obtained from new closings. The debtor also floated checks in his account. *See id.* When the float was insufficient to cover the deficiency, the attorney became increasingly dependent upon new monies coming in from new closings in order to cover the checks which were being held in previous closings. *See id.* In looking for new ways to try to bring his escrow account current, the attorney began using the remaining escrow funds to trade in commodities. *See id.* Following the filing of a chapter 7 petition, the chapter 7 trustee sought to avoid, pursuant to section 548(a)(1)(A), the transfers that the debtor paid to the futures commission merchant. Thus, the trustee was not seeking to avoid payments made to the early investors. Moreover, the attorney was not engaged in a classic Ponzi scheme, in that the attorney was continuing to provide legal services associated with real estate closings. Nonetheless, the court extended the *Independent Clearing House* and *In re Mark Benskin & Co., Inc.* rationale, holding that "[o]ne can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed no other reasonable inference is possible." *Id.* at 590. (*citing In re Independent Clearing House Co.,* 77 B.R. at 860). The court further noted that

"[w]hile it is arguable that Cannon was not engaged in a 'classic' Ponzi scheme" he "knew that if he could not sustain the concealment, his fraud would be discovered and the last group of clients would be left with nothing." *See id.* Thus, the court concluded that the mere fact that the debtor was operating a Ponzi scheme, coupled with his guilty plea, demonstrate that Cannon had the requisite fraudulent intent under section 548(a)(1) with respect to the transfers at issue. *See id.* at 591. Accordingly, the court extended the presumption of fraudulent intent to transfers other than payments to early investors. *See also, Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods),* 280 B.R. 103 (Bankr.E.D.Pa.2002) (holding that contributions to a charitable organization by a debtor operating a Ponzi scheme are presumed to have been made with fraudulent intent under section 548(a)(1)(A)). The court in *C.F. Foods* held that "[i]t is also reasonable ... to infer that, except for transfers to a person who took in good faith and for a reasonably equivalent value, as described in ... § 548(c) of the Bankruptcy Code, all other transfers made by the debtor during an on-going Ponzi scheme are part of the overall fraud." *See id.* at 111. (*contra Stratton v. Equitable Bank, N.A.,* 104 B.R. 713 (D.Md.1989), *aff'd,* 912 F.2d 464 (4th Cir.1990)) (holding that trustee failed to support a claim that payments made in connection with a Ponzi scheme were made with actual intent to defraud creditors pursuant to section 548(a)(1)(A), primarily on grounds that "both present and future creditors benefitted as a result of this extension of credit in the millions of dollars.").

■ Moreover, Bear Stearns' argument that actual fraudulent intent cannot be presumed in this case because the margin payments at issue were made in connection with a legitimate business outside of the

Ponzi scheme—namely, the short selling of securities—is ludicrous. First, Michael Berger pled guilty to criminal charges of securities fraud. *See United States of America v. Berger,* No. 00 CR 877(VM), *Transcript of Hearing, (Berger Transcript)* at 5, Nov. 27, 2000 (S.D.N.Y.2000). Specifically, Berger pled guilty to criminal charges of "fraud in connection with the purchase and sale of securities ... while working for Manhattan Investment Fund ... from in or about September 1996 through in or around January 2000, in violation of Title 15 of the United States Code, Sections 78(j)(B) and 78(f)(F) and Title 17 of the Code of Federal Regulations, Section 240.10(b)(5)." *Berger Transcript* at 10. Berger acknowledged that in pleading guilty to these charges, he was pleading guilty to the specific elements of "unlawfully, willfully, and knowingly, ... using, in connection with the purchase and sale of securities, manipulative and deceptive devices and ... employing schemes and artifices to defraud, and engaging in acts and courses of business that operated and would operate as a fraud and deceit upon persons." *See Berger Transcript* at 10, 11. Accordingly, it is impossible for this Court to understand how Bear Stearns attempts to characterize Berger's continued short selling activities as a legitimate business enterprise. Moreover, "a guilty plea or criminal conviction of the perpetrator of the Ponzi scheme provides evidence of actual fraudulent intent." *In re C.F. Foods,* 280 B.R. at 111 (*citing Floyd v. Dunson, (In re Ramirez),* 209 B.R. 424, 433 (Bankr.S.D.Tex.1997)). Accordingly, I find that by citing to Berger's guilty plea and conviction, coupled with the fact that the margin payments were made in connection with a massive Ponzi scheme, the Trustee has sufficiently alleged facts pursuant to Bankruptcy Rules 7009(b) and 7012(b) to withstand Bear Stearns' Motion to Dismiss.

### The Doctrine of the Law of the Case

■ Bear Stearns further argues that the Trustee is precluded from advancing her "aiding and abetting" theory under the doctrine of the law of the case. Under the doctrine of the law of the case, when an appellate court has decided an issue, the trial court, at a later stage in the same litigation, is under a duty to follow the appellate court's ruling on that issue. *See In re Chateaugay Corp.,* 136 B.R. at 83 (Bankr.S.D.N.Y.1992) (*citing Doe v. New York City Dep't of Social Services,* 709 F.2d 782, 788 (2d Cir.1983)) (*citing United States v. Cirami,* 563 F.2d 26, 32 (2d Cir. 1977)); *see also, In re PCH Associates,* 949 F.2d 585, 592 (2d Cir.1991) ("a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation."). This doctrine applies to issues decided expressly or by necessary implication, *see In re Chateaugay Corp.,* 136 B.R. at 83; *United States v. Yonkers Bd. Of Educ.,* 856 F.2d 7,11 (2d Cir.1988), and does not include issues which have not been specifically decided. *See In re Chateaugay Corp.,* 136 B.R. at 84; *In re PCH Associates,* 949 F.2d at 593.

Bear Stearns asserts that language contained in the *Bear Stearns v. Gredd* decision precludes the Trustee from alleging that Bear Stearns aided and abetted the Fund's fraudulent activities. Bear Stearns misapplies the law of the case doctrine for several reasons. The comments made by the District Court in *Bear Stearns v. Gredd* do not specifically decide any dispositive issues of Count I of the Trustee's complaint. By Judge Buchwald's express direction, the only issue argued to and decided by the District Court related to the requirements for establishing a debtor's interest in property—an issue that Bear Stearns has already conceded in the

Trustee's favor with respect to Count I. *Bear Stearns v. Gredd,* 275 B.R. at 191, 192 fn. 5 (the "specific issue which [the District Court] found to require consideration of non-bankruptcy federal law was whether the proceeds generated from short sales of stock [totaling $1.7 billion], and [approximately $1.9 billion worth of] securities later purchased to cover those short sales, constituted 'interests of the debtor in property' within the meaning of 11 U.S.C. § 548(a)(1)(A).""). The District Court dismissed Counts II and III, holding that because federal securities laws mandate that the sums sought be avoided be transferred only to Bear Stearns, such funds were never available to satisfy the claims of any other creditors. *See id.* at 198.[7] Accordingly, the District Court held that the transfers would not have been available for distribution to other creditors, and consequently were not transfers of an "interest of the debtor in property." *See id.*

 However, the District Court's ruling that the Debtor did not have an interest in the property subject to Counts II and III is inapposite to the issue now before this Court. While the doctrine of the law of the case prevents re-litigation of the same issues, it does not preclude further determinations of different or new issues currently before the Court. *See In re Chateaugay Corp.,* 136 B.R. at 83. The issue of whether the debtor has an interest in property is separate from the issue of whether the debtor made a transfer with actual intent to defraud its creditors. Moreover, a transferee's good faith, or lack thereof, is not pertinent to establishing a prima facie case under section 548(a)(1)(A). *See In re Adler, Coleman Clearing Corp.,* 263 B.R. 406, 438 (S.D.N.Y.2001); *Mark Benskin & Co.,* 161 B.R. at 651 ("Section 548(a) does not, moreover, test the knowledge or intent of the transferee. It is the debtor/transferor's intent . . . that is at issue.").

 Moreover, the District Court's language does not preclude the Trustee from asserting, in connection with Count I, that Bear Stearns facilitated Berger's fraud by continuing to extend margin credit to the Fund. This issue was neither specifically litigated by the parties, nor ruled upon by the District Court. Nor was it necessary to the Court's holding that federal securities law prevented the Debtor's other creditors from recovering the transferred assets. Insofar as the language regarding the Trustee's aiding and abetting theory of Bear Stearns' liability was not necessary to the Court's ultimate holding, it is arguably *dicta* and does not have a binding effect on this Court pursuant to the law of the case doctrine.

 Further, the District Court's comments refer to the finding in *Cromer Finance,* where several of the Fund's investors asserted that Bear Stearns aided and abetted Berger's fraud and breach of fiduciary duties when Bear Stearns allegedly over-extended margin credit to the Fund. *See id.* at 471. The District Court granted Bear Stearns' motion to dismiss in that

---

7. Particularly, the District Court held that any proceeds from the short sale are frozen under 12 C.F.R. § 220.1 (Regulation T). *See id.* at 197. According to the District Court, Regulation T, which regulates extensions of credit by brokers and dealers, requires that customers maintain a margin account with their broker that contains at all times, funds equivalent to 150% of the current market value of the securities sold short. 12 C.F.R. § 220.12(c)(1);

*see id.* The District Court ruled that until the seller covers the short sale, and "even when the short seller covers some of his short sales, the broker may only release these frozen funds to the extent that the customer's account balance exceeds the margin requirements established by Regulation T." *Id. (citing* Federal Reserve Staff Opinion, Nov. 21, 1979, F.R.R.S. 5–693).

action on the grounds that a "failure to enforce margin requirements, or continuing to execute trades, despite margin violations, does not constitute substantial assistance." *See id.* The District Court's ruling in that class action is not binding upon the Trustee because she was not a party to that action. *See Ackerman v. Schultz,* 250 B.R. 22, 27–28 (Bankr. E.D.N.Y.2000) (earlier ruling did not preclude trustee's claim under either collateral estoppel or law of the case doctrine because the trustee was not a party to the earlier proceeding).

### Public Policy Argument

 Finally, Bear Stearns argues that the complaint should be dismissed because the use of section 548(a)(1)(A) to recover margin payments relating to short sale security transactions is contrary to public policy. Particularly, Bear Stearns once again relies on the District Court's decision in *Bear Stearns v. Gredd,* which noted that the margin regulations were "designed to protect brokerage houses," and that brokers such as Bear Stearns help securities markets function efficiently. 275 B.R. at 198. However, section 546(e) expressly permits a trustee to avoid margin payments under section 548(a)(1)(A) of the Bankruptcy Code. Aware of the necessity of the services provided by clearing brokers, Congress only *limited* trustees' ability to avoid margin payments in bankruptcy under section 546(e) of the Bankruptcy Code. The legislative intent behind section 546(e) was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." H.Rep. No. 420, 97th Cong., 2d Sess. 1 (1982), U.S.Code Cong. & Admin.News 1982, 583, 583; *Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Resources, Inc.),* 198 B.R. 352, 356 (Bankr.D.Colo.1996). By enacting section 546(e), Congress determined that margin payments should be shielded from the full reach of creditor protections of the fraudulent conveyance laws, with recovery permitted only for transfers occurring within one year of a bankruptcy petition that involve actual fraud. *See id.* Accordingly, the avoidance of margin payments pursuant to section 548(a)(1)(A) is not contrary to public policy, rather, it is a provision specifically set forth in the Bankruptcy Code.

For all of the reasons explained above, the motion to dismiss Count I is denied.

### Count IV

 Bear Stearns asserts, *inter alia,* that Count IV, the equitable subordination claim, is not ripe as no proof of claim has been (or may ever be) filed. However, the fraudulent conveyance claim in Count I and the equitable subordination claim in Count IV are based on the same intertwined operative facts. By allowing them both to go forward, this Court can consider all claims "in the interest of prudence and judicial economy." *In re Elite Marketing Enterprises, Inc.,* 2001 WL 1669229, *5 (Bankr.N.D.Ill.2001). The factual basis for this claim is closely entwined with the factual bases of Count I. Therefore, in the interest of prudence and judicial economy, the Court will consider the issue in conjunction with the Trustee's other claims. The Trustee has offered to withdraw Count IV if Bear Stearns agrees to stipulate that it will not claim back in the event of a recovery under Count I. Absent such stipulation, this Court's determination of Count I either ripens or eliminates Count IV. Accordingly, it is appropriate for the two causes of action to go forward together. The motion to dismiss Count IV is therefore denied.

It is so ordered.