**In re MANHATTAN INVESTMENT FUND LTD., et al., Debtors.**

**Helen Gredd, Chapter 11 Trustee for Manhattan Investment Fund Ltd., et al., Plaintiffs,**

v.

**Bear, Stearns Securities Corp., Defendant.**

**Bankruptcy Nos. 00–10922 BRL, 00–10921 BRL.**

**Adversary No. 01–2606.**

United States Bankruptcy Court, S.D. New York.

Jan. 9, 2007.

Lankler Siffert & Wohl, LLP, by Helen Gredd, Esq., Daniel E. Reynolds, Esq., Ropes & Gray LLP, by Marc E. Hirshfield, Esq., New York, NY, Attorneys for Chapter 11 Trustee.

Schulte, Roth & Zabel LLP, by Harry S. Davis, Esq., New York, NY, Attorneys for Bear Stearns Securities Corp.

*MEMORANDUM DECISION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT TO DISMISS AND GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT*

BURTON R. LIFLAND, Bankruptcy Judge.

Before this Court are cross motions for summary judgment on Count I of a Complaint filed by Helen Gredd as Chapter 11 Trustee (the "Trustee") for Manhattan Investment Fund Ltd. (the "Fund" or "Debtor"), against Bear, Stearns Securities

Corp. ("Bear Stearns") pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Count I of the Trustee's complaint seeks to avoid $141.4 million in margin payments deposited into the Fund's account at Bear Stearns. Bear Stearns moves for summary judgment dismissing the Trustee's complaint in its entirety.

**Procedural History**

"This adversary proceeding is an outgrowth of a massive Ponzi scheme executed by Michael Berger ('Berger') a convicted felon and fugitive," *Gredd v. Bear Stearns Securities Corp. (In re Manhattan Investment Fund Ltd.)*, 310 B.R. 500, 502 (Bankr.S.D.N.Y.2002), who created and used the Fund through his wholly owned company Manhattan Capital Management, Inc ("MCM"), as his vehicle to perpetrate fraud. On January 14, 2000, following an investigation into the Fund's trading activities, the Securities and Exchange Commission (the "SEC"), filed a complaint alleging securities fraud against the Fund, MCM and Berger. The SEC obtained an asset freeze and the appointment of Helen Gredd as Receiver for the Fund. On March 7, 2000 (the "Petition Date"), the Receiver caused the Fund to file a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), and on April 4, 2000, the Receiver was appointed Trustee of the Fund under Chapter 11 of the Bankruptcy Code.

On April 24, 2000, the Trustee commenced this adversary proceeding against Bear Stearns. In her complaint, the Trustee sought to avoid, pursuant to section 548(a)(1)(A) of the Bankruptcy Code, three categories of transfers that were made to Bear Stearns in connection with the Fund's short selling activities during the last ten months of its operation. Count I of the complaint seeks to avoid $141.1 million in margin payments which Berger caused to be transferred to Bear Stearns from the Fund's account with the Bank of Bermuda. Count II sought to recover approximately $1.7 billion in short sale proceeds as generated by the sale of stock that the Fund borrowed from Bear Stearns. Count III of the complaint sought to recover approximately $1.9 billion worth of securities that were purchased with the short sale proceeds (plus other monies in the Fund's margin account), that were delivered to Bear Stearns to cover stock loans to the Fund. Count IV of the complaint seeks equitable subordination of any claim Bear Stearns may assert in the Fund's chapter 11 case to all other claims.

In May 2001, Bear Stearns moved to withdraw the reference of this adversary proceeding from this Court to the District Court, and on July 25, 2002, the District Court granted Bear Stearns' motion for the limited purpose of determining whether the Debtor had an interest in the alleged transfers subject to Counts II and III of the complaint. *See Bear Stearns v. Gredd (In re Manhattan Investment Fund Ltd.)*, 2001 WL 840187 (S.D.N.Y. July 25, 2001). Bear Stearns then moved to dismiss Counts II and III of the complaint on the grounds that the transfers sought to be avoided were not transfers of property in which the Fund had an interest. By Opinion and Order dated March 22, 2002, the District Court granted Bear Stearns' motion, dismissed Counts II and III, reinstated the reference and remanded the remaining Counts to this Court for further proceedings. *See Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.)*, 275 B.R. 190, 198 (S.D.N.Y.2002).

On May 10, 2002, Bear Stearns moved before this Court to dismiss both remaining counts pursuant to Bankruptcy Rules 7009(b) and 7012(a) arguing, *inter alia,*

that the Trustee had not adequately alleged that the transfers were made with "actual intent" to defraud the Fund's creditors as required under section 548(a)(1)(A) of the Bankruptcy Code. Specifically, Bear Stearns argued that the presumption of fraudulent intent that courts have applied to operators of Ponzi schemes should not be applied in this instance because the transfers at issue were made in connection with legitimate and fully disclosed trading, outside the realm of the Ponzi scheme. Finding that the Trustee had sufficiently alleged facts to withstand dismissal of the remaining counts, this Court denied the motion. *Gredd,* 310 B.R. at 513. This Court also found that it was appropriate to apply a presumption of actual intent to defraud on the part of the Debtor "regardless of whether the payments were made to early investors or whether the debtor was engaged in a strictly classic Ponzi scheme." *Id* at 509.

On October 17, 2002, Bear Sterns' moved for an order granting interlocutory leave to appeal from this Court's denial of the motion to dismiss. By memorandum opinion dated December 20, 2002, the District Court denied that motion. *See Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.),* 288 B.R. 52 (S.D.N.Y.2002).

On March 10, 2006, Bear Stearns once again moved for an order withdrawing the adversary proceeding from this Court. By memorandum opinion and order dated May 31, 2006, the District Court denied the motion based upon the law of the case doctrine, and alternatively, for untimeliness. *See Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund Ltd.),* 343 B.R. 63 (S.D.N.Y.2006).[1] Consequently, familiarity with the facts is assumed, and only a brief overview of the facts relevant to this proceeding is discussed below.

## Background

In the year prior to the Petition Date, the Fund made eighteen separate transfers totaling $141.4 million (collectively, the "Transfers"), from its account at Bank of Bermuda to an account maintained by Bear Stearns at Citibank. Those monies were then transferred to the Fund's Bear Stearns account. The monies in the Fund's Bear Stearns account were used by the Fund to engage in securities trading. The Bear Stearns account was subject to a Professional Account Agreement (the "Agreement") between Berger and Bear Stearns which provided, in relevant part, that: (1) Bear Stearns had the right to set the level of maintenance margin;[2] (2)

1. In that opinion the District Court noted

    This is the fourth opinion this Court has issued in this case. *See Bear, Stearns Sec. Corp. v. Gredd,* 01 Civ. 4379(NRB), 2001 WL 840187 (S.D.N.Y. July 25, 2001) (granting first motion to withdraw reference for Counts II and III of the complaint) *("Gredd I"); Bear, Stearns Sec. Corp. v. Gredd,* 275 B.R. 190 (S.D.N.Y.2002) (granting defendant's motion to dismiss Counts II and III) *("Gredd II"); In re Manhattan Investment Fund Ltd.,* 288 B.R. 52 (denying defendant's motion for interlocutory appeal of Bankruptcy Court decision denying motion to dismiss Counts I and IV) *("Gredd III").* The Bankruptcy Court has also issued an opinion in this matter, denying defendant's

    motion to dismiss Counts I and IV, which are the counts defendant now seeks to have adjudicated before this Court. *See In re Manhattan Investment Fund Ltd.,* 310 B.R. 500 (Bankr.S.D.N.Y.2002). Moreover, several other Southern District Judges have issued a total of twelve opinions and orders in civil and criminal cases arising out of the same underlying facts. *Id.* at 65; *see also United States v. Berger,* 188 F.Supp.2d 307 (S.D.N.Y.2002); *Securities and Exchange Commission v. Berger,* 244 F.Supp.2d 180 (S.D.N.Y.2001); *Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d 452 (S.D.N.Y.2001).

2. Paragraph 17 of the Agreement provides, in relevant part, that

Bear Stearns had a security interest in all monies held in the account;[3] (3) Bear Stearns had sole discretion to prevent the Fund from withdrawing any money credited to its account as long as any short positions remained open; and (4) Bear Stearns had sole discretion to use any and all monies credited to the Fund's account to liquidate the Fund's open short positions with or without the Fund's consent.[4] The Agreement and the account itself were governed by SEC Rule 15c3–3 which expressly precludes Bear Stearns from using the funds in the account for any purpose other than those outlined in the agreement. *See* 17 C.F.R. § 240.15c3–3(e)(2).

After questions about the Fund and its activity arose and the SEC was investigating it, Bear Stearns put the Fund on "closing only" status in January 2000, meaning that no new positions could be opened by the Fund and no money withdrawn until all existing positions were closed out. *(See* Trustee's Mem. in Supp. at 21, fn. 93). Following Berger's confession of fraud Bear Stearns closed out all of the remaining short positions in the Fund's account using the monies in the account to do so.

In March 2000, Trustee requested that Bear Stearns wire the remaining $16,288,746.46 in the Fund's account to the Fund's bank account at Chase Manhattan and in April 2000, Bear Stearns did so. As prime broker, Bear Stearns made approximately $2.4 million in revenue for its services over the course of its involvement with the Fund.

The Trustee now seeks summary judgment to avoid the Transfers under section 548(a)(1)(A) of the Bankruptcy Code. The Trustee contends that: (1) the Transfers were made with actual intent to hinder, delay or defraud the Fund's creditors and without which the Fund could not have continued to operate and further perpetrate its fraud; (2) Bear Stearns is not a mere conduit and is therefore a "transferee" under section 550(a) of the Bankruptcy Code; and (3) that Bear Stearns cannot prove that it accepted the Transfers in good faith. In opposition, Bear Stearns contends that: (1) the Trustee may not recover the Transfers because Bear Stearns lacked legal dominion and control over the Transfers and was therefore not a "transferee" under section 550(a) of the

You hereby agree to deposit and maintain such margin in any of your margin accounts as Bear Sterns in its sole discretion requires . . . .

Paragraph 4 of the Agreement provides, in relevant part, that

Whenever Bear Sterns, in its sole discretion, considers it necessary for its protection, it may require you, and you hereby agree, to deposit cash or collateral immediately in your account(s) prior to any applicable settlement date in order to assure due performance of your open contractual commitments.

3. Paragraph 3 of the Agreement provides, in relevant part, that

As security for the payment and performance of all your obligations and liabilities to any Bear Sterns entity, each Bear Sterns entity shall have a continuing security interest in all property in which you have an

interest held by or through a Bear Sterns entity, including securities, commodity futures contracts . . . .

4. Paragraph 3 of the Agreement provides further that,

In addition, in order to satisfy any such outstanding liabilities or obligations, Bear Sterns may, at any time and without prior notice to you, use apply or transfer any such securities or property interchangeable including cash and fully-paid securities.

In addition, paragraph 5 provides in relevant part,

In the event of default, each Bear Sterns entity reserves the right to sell, without prior notice to you, any and all property in which you have an interest held by or through Bear Sterns . . . to offset market risk, after which you shall be liable to Bear Sterns for any remaining deficiency, loss . . . .

Bankruptcy Code; (2) the Trustee did not meet her burden in proving that the Transfers were made with an actual intent to hinder, delay or defraud the Fund's creditors; (3) the Transfers should not be recoverable from Bear Stearns based on public policy reasons; and (4) Bear Stearns acted in good faith in accepting the Transfers.

**Discussion**

Under Rule 56(c) of the Federal Rules of Civil Procedure, made applicable through Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment "shall" be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment will be granted in favor of a party "if there is no genuine issue of material fact" establishing the party's entitlement to the relief it seeks). The parties here agree that the material facts are not in dispute.

*Avoiding Powers*

The Bankruptcy Code bestows broad powers upon a trustee to avoid certain transfers of property made by the debtor before the filing of the bankruptcy petition. "In this way, the transferred property is returned to the estate for the benefit of all persons who have presented valid claims." *See Christy v. Alexander & Alexander of NY, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 55 (2d Cir.1997). Specifically, section 548 of the Bankruptcy Code provides for the avoidance of any transfer of an interest in property made by the debtor in the year prior to the filing of its bankruptcy petition as a

fraudulent conveyance provided that the transfer was made with an actual fraudulent intent or with the badges of fraud constituting constructive fraud of the debtor's creditors. *See* 11 U.S.C. § 548(A) and (B). A fraudulent conveyance avoided under section 548 is recoverable by the Trustee under section 550(a) which provides, in relevant part, "the trustee may recover, ... the property transferred, or, if the court so orders, the value of such property, from (1) the *initial transferee* of such transfer or the entity for whose benefit such transfer was made ..." 11 U.S.C. § 550(a) (emphasis added).

However, section 546(e) of the Bankruptcy Code, commonly known as the "stockbroker defense," prevents the trustee from avoiding margin payments made to a stockbroker except where there is actual fraud. *See* 11 U.S.C. § 546(e); *Wider v. Wootton*, 907 F.2d 570, 572 (5th Cir.1990). Legislative history reveals that Congress was concerned about the volatile nature of the commodities and securities markets, and decided that certain protections were necessary to prevent "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market." *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742, 751 (3d Cir. 1989) citing H. REP. NO. 97–420, 97th Cong., 2d Sess. 1 (1982), U.S.Code Cong. & Admin.News 1982, p. 583; *see also Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.)*, 323 B.R. 857, 864 (Bankr. S.D.N.Y.2005) ("the purpose of section 546 is to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions.") *citing Kaiser Steel Corp. v. Charles Schwab & Co., Inc. (In re Kaiser Steel Corp.)*, 913 F.2d 846, 849 (10th Cir.1990).

Section 548(a)(1)(A), referred to as the "actual fraud" provision, requires that in order to avoid a transfer, it must be made with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred or indebted. 11 U.S.C. § 548(a)(1)(A). *Gredd*, 310 B.R. at 505 citing *Frierdich v. Mottaz*, 294 F.3d 864 (7th Cir.2002).

*Fraudulent Nature of the Transfers*

■ The eighteen Transfers at issue in this matter were deposited by the Fund in its account at Bear Stearns to allow it to continue short selling activities within the year prior to the Petition Date. To engage in short sales, federal securities regulations required the Fund to maintain its margin account with Bear Stearns at a specified level. Bear Stearns, in turn, could, and did, make those requirements more stringent based on the level of risk at which it perceived the Fund's trading to be. The Transfers were made in order to open new short positions or to comply with the requirements of its margin account in order to continue trading. As such, the Transfers fit squarely within the definition of a margin payment as defined in sections 101, 741, and 761 of the Bankruptcy Code.[5]

The Trustee argues that the Transfers are within the exception to section 546(e) of the Bankruptcy Code because the transfers were made in furtherance of a "Ponzi" scheme. "A 'Ponzi' or 'Pyramid' scheme is a fraudulent investment scheme in which money contributed by later investors is used to pay artificially high dividends to the original investors, creating an illusion of profitability, thus attracting new investors." *See In re The Bennett Funding Group, Inc.*, 439 F.3d 155, 157 (2d Cir. 2006) (citing *Black's Law Dictionary* 1198 (8th ed.2004)); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n. 3 (2d Cir.1995) (citation omitted) ("A Ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors."); *Drenis v. Haligiannis*, 452 F.Supp.2d 418, 422 (S.D.N.Y.2006) (case involved a hedge fund Ponzi scheme, "a species of fraud whereby an investment fund that is unprofitable uses money from new investors to pay 'false profits' to old investors in order to encourage further investment and sustain the scheme.");[6] *see also Jobin v. McKay (In re M & L Business Mach. Co., Inc.)*, 84 F.3d 1330, 1332 n. 1 (10th Cir.1996) ("We have defined a Ponzi scheme as an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments.")

■ Actual intent to hinder, delay or defraud may be established as a matter of law in cases in which the debtor runs a Ponzi scheme or a similar illegitimate enterprise, because transfers made in the course of a Ponzi operation could have been made for no purpose other than to

---

5. The term "margin payment" means, for purposes of the forward contract provisions of this title, payment or deposit of cash, a security or other property, that is commonly known in the forward contract trade as original margin, initial margin, maintenance margin, or variation margin including mark-to-market payments or variation payments. *See*

11 U.S.C. § 101(38); *see also* 11 U.S.C. § 741(5) (stockbroker liquidation definitions); 11 U.S.C. § 761(15) (commodity broker liquidation definitions).

6. The defendant in that case, Angelo Haligiannis, like Berger, also was indicted, fled the jurisdiction and remains a fugitive.

hinder, delay or defraud creditors. Thus, "courts nationwide have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud." *Rieser v. Hayslip (In re Canyon Systems Corp.)*, 343 B.R. 615, 637 (Bankr.S.D.Ohio 2006) (citing cases).

■ Moreover, acts taken in furtherance of the Ponzi scheme, such as paying brokers commissions, are also fraudulent. "Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay or defraud creditors, primarily the new investors." *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 656 (Bankr.M.D.Fla.2002); *see also S.E.C. v. Cook*, 00 Civ. 272, 2001 WL 256172, at *3 (N.D.Tex. Mar.8, 2001) ("[W]hen [a person running a Ponzi scheme] takes incoming funds and transfers them to early investors and brokers, he is making such transfers with the actual intent to hinder, delay or defraud later investors and creditors." (Citations omitted))

■ Bear Stearns argues that there was no fraud. However, this Court, along with the District Court has already determined that issue. In ruling on Bear Stearns' motion to dismiss Counts I and IV, this Court explained that, "[w]hen a debtor operating a Ponzi scheme makes a payment with the knowledge that future creditors will not be paid, that payment is presumed to have been made with actual intent to hinder, delay or defraud other creditors-regardless of whether payments were made to early investors, or whether the debtor was engaged in a strictly classic Ponzi scheme." *In re Manhattan Investment Fund*, 310 B.R. 500, 509 (Bankr. S.D.N.Y.2002). In light of Berger's guilty

plea and conviction coupled with the fact that the margin payments were made in connection with a massive Ponzi scheme,[7] this Court finds sufficient evidence of actual fraudulent intent in connection with the Transfers. *Id.* at 511 ("[A] guilty plea or criminal conviction of the perpetrator of the Ponzi scheme provides evidence of actual fraudulent intent."). Similarly, the District Court found that "[t]his action arises out of a Ponzi scheme engineered by Michael Berger, the Fund's manager, who sought to cover losses from ill-advised short sales of technology stocks with deposits made by new investors. The results were disastrous; the Fund hemorrhaged hundreds of millions of dollars and Mr. Berger was criminally prosecuted, pleading guilty to securities fraud." *In re Manhattan Invest. Fund Ltd.*, 343 B.R. 63, 65 (S.D.N.Y.2006). Accordingly, the issue is whether or not the payments may be recovered from Bear Stearns as an initial transferee under section 550(a)(1).

*Initial Transferee*

■ Bear Stearns argues that it is a "mere conduit" and not an initial transferee. The Bankruptcy Code does not define the term "transferee" and as such the "mere conduit" defense has arisen as a defense to liability in avoidance actions. *Poonja v. Charles Schwab & Co., Inc. (In re Dominion Corp.)*, 199 B.R. 410, 413 (9th Cir. BAP 1996). In the course of examining the "mere conduit" defense, courts have used a "dominion and control" test to determine if an entity is an initial transferee from which an avoided transfer may be recovered under section 550(a)(1). *Id.* In order to be an initial transferee courts require something more than being the "first hands" to touch the asset, but rather that the entity have the requisite dominion

---

7. In 1998, Berger collected nearly $200 million in investment principal, lost more than $197 million in trading while claiming gains of more than $33 million.

and control over the transferred asset. *See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 130 F.3d at 56–57; *see also In re Kaiser Steel Corp.,* 105 B.R. 639, 644 (Bankr. D.Colo.1989) ("The phrase 'mere conduit,' or some variation thereof, has been coined by various courts to characterize those 'innocent' entities which are only agents or pass throughs of the transferee.").

Judge Easterbrook in the Seventh Circuit articulated the "dominion and control" test in *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890 (7th Cir.1988). In that case, Bonded, the debtor, a currency exchange, made $200,000 available to its principal Mike Ryan. *Id.* at 891. Debtor subsequently sent a check payable to European American Bank's order directing the funds be deposited into Mr. Ryan's account and the bank followed these instructions. *Id.* Mr. Ryan later instructed the bank to debit $200,000 from his account to reduce his outstanding balance with the bank on his personal loan. *Id.* The trustee claimed that the bank was the initial transferee of the funds because it was the payee of the check. The court held that the bank was neither an initial transferee of the check nor an entity for whose benefit the transfer was made, but rather, acted as financial intermediary, which held the check only for the purpose of fulfilling an instruction to make funds available to someone else. *Id.* at 893. Instead, the court found that Mr. Ryan was the initial transferee as he had the debtor's funds in his personal account for 10 days before he transferred the money to the bank to satisfy his debt on a loan. *Id.* The *Bonded* court stated that it was clear that Mr. Ryan had the "right to put the money to [his] own purposes" for 10 days. *Id.* He could have paid the loan, as he did, or "invest[ed] the whole [amount] in lottery tickets or uranium stocks." *Id.* at 894. Moreover, if the check sent to the bank had express instructions to use the funds to reduce Mr. Ryan's loan then the bank would be the initial transferee and Mr. Ryan the entity for whose benefit the transfer was made under section 550(a). *Id.* at 892, 895. In so deciding, the court articulated "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the 'initial transferee;' the agent may be disregarded." *Id.* at 893.

Several courts including the Second Circuit Court of Appeals have adopted the dominion and control test. *See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 130 F.3d at 58 (finding insurance broker to be mere conduit of premiums transferred from debtor law firm paid to insurer despite broker's participation in the firm's selection of insurance); *see also Andreini & Co. v. Pony Express Delivery Servs. (In re Pony Express Delivery Servs.),* 440 F.3d 1296 (11th Cir.2006) (insurance broker found to be mere conduit of insurance premiums paid by debtor to broker two days before filing bankruptcy using dominion and control test); *In re Dominion Corp.,* 199 B.R. 410 (9th Cir. BAP 1996) (securities broker, which held funds in securities account opened post petition by Chapter 11 debtor's principal with money from the estate and without debtor corporation's authorization, was mere conduit under dominion and control test where transfers in and out of the account involved automatically transferred funds committed to the brokerage firm by the debtor for the purpose of payment of the debits against the brokerage firm by a bank for the debtor's personal purchases); *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.),* 33 B.R. 334 (Bankr.S.D.N.Y.1983) (law

firm maintaining an escrow account in which it received payment from the debtor to settle a dispute and then transferred funds to its client acted as a mere conduit and was not an initial transferee under the dominion and control test); *Geltzer v. D'Antona (In re The Cassandra Group)*, 312 B.R. 491, 496 (Bankr.S.D.N.Y.2004) (adopting the *Bonded* test and holding that an attorney with "broad powers" over a client's account such as the power to pay his own fees was not a transferee because he never had sufficient dominion and control over the [transfers] ); *compared with Authentic Fitness Corp. v. Dobbs Temporary Help Svcs., Inc. (In re The Warnaco Group, Inc.)*, 2006 WL 278152 (S.D.N.Y. Feb.2, 2006) (staffing agency found to be an initial transferee of debtor's payment using the dominion and control test because despite the fact that the agency was obligated to pay the employees their wages, withholding tax and insurance premiums it could have also used the money to pay its overhead).

The Ninth Circuit recently explained the "mere conduit" or "dominion and control" test as actually being two distinct tests: the dominion test and the control test. *Universal Service Administrative Co. v. Post Confirmation Committee of Unsecured Creditors of Incomnet Communications (In re Incomnet)*, 463 F.3d 1064, 1071 (9th Cir.2006). The court stated that the dominion test is one of legal dominion over the transfers and the control test instead focuses on the context of the situation and the actual control of the transfers taking the situation as a whole. *Id.* at 1070. The dominion test requires a higher standard of legal dominion; and the control test looks to who has actual control and focuses more on fairness under the circumstances. The Ninth Circuit, in its decision, acknowledged that while it draws a distinction between the dominion test and the control test that a number of circuits, including the Seventh Circuit and the Second Circuit, combine the two tests creating the "dominion and control test".[8] *In re Incomnet*, 463 F.3d at 1071. Both parties to this action concede that the dominion and control test as articulated in *Bonded* and followed by in the Second Circuit governs this issue.

Bear Stearns contends that the Agreement relied upon by the Trustee to prove Bear Stearns' dominion and control over the transfers is standard in the industry and that such boilerplate provisions cannot give rise to initial transferee status. *(See* Bear Stearns' Mem. in Opp. at 13–16.) Bear Stearns further contends that because the SEC regulations set requirements on accounts such as the Fund's account to protect against misuse or abuse of customer funds that these regulations by their nature preclude the Court from finding Bear Stearns an initial transferee. *(See* Bear Stearns' Mem. in Opp. at 13, 14); *see also* 17 C.F.R. § 240.15c3–3(e)(2). In support of its argument, Bear Stearns relies on the Eleventh Circuit's decision *In re Pony Express Delivery Services.* In that case, the court found Andreini, the debtor's insurance broker, to be a mere conduit as to premiums paid to the broker by the debtor two days before the debtor's bankruptcy filing. *In re Pony Express Delivery Services*, 440 F.3d at 1296. However, in its decision, the Court explained

---

8. Dan Schechter, Professor of Law at Loyola Law School in Los Angeles, recently commented on the *Incomnet* decision by observing that "[t]he doctrine of 'dominion and control ...' is now in a state of hopeless confusion, both inside the Ninth Circuit and among the several circuits." Dan Schechter, *Preference Recipient Has "Dominion" over Funds, Even If Recipient is under Statutory Duty to Transmit the Funds to a Third Party. [In re Incomnet (9th Cir.) ]*, 2006 Com. Fin. News 71 (Sept. 20, 2006).

the dominion and control test as it applies to entities having special legal relationships:

> "Often ... fiduciaries or agents are not considered initial transferees because their legal control over the assets received is circumscribed by their legal duties to their clients ... **However, even entities that have special legal relationships with the debtor-transferor can be initial transferees when they do, in fact, take legal control of an avoidable transfer; for example when they receive assets directly from the debtor-transferor as compensation for services or in payment of a genuine debt**....Where a fiduciary, agent, or other entity with legal obligations to the debtor-transferor is the recipient of an avoidable transfer, the control test turns on the recipient's legal rights and obligations toward the transferred assets, not simply their legal relationship with the debtor-transferor or the ultimate use of the assets. To ascertain these rights and obligations, and decide whether such a recipient is an initial transferee under 11 U.S.C. § 550, courts must look at all the circumstances of the transaction that resulted in the avoidable transfer."

*In re Pony Express Delivery Services*, 440 F.3d at 1301 (emphasis added).

Bear Sterns also argues that the dominion and control test requires full legal dominion and control such that the transferee must have the legal right "to put the money to one's own purpose" and must be "free to invest the whole [amount] in lottery tickets or uranium stocks." Bear Stearns contends that the fact that it could only use the monies in the Fund's account for a limited purpose, as proscribed both under the terms of its Agreement with Berger and the SEC regulations, shows it did not have the requisite dominion and control to be an initial transferee.

Recently, however, the Ninth Circuit explained, "it is of no consequence that the recipient cannot invest funds in—'to use the Seventh Circuit's colorful phrase—'lottery tickets or uranium stocks ...' [The statutory] legal restrictions merely limit how [the recipient] will exercise its dominion over the funds; they do not preclude [it] from having dominion at all." *In re Incomnet*, 463 F.3d at 1074 ("the fact that [the recipient] can only spend the [funds] in accordance with certain federal regulations does not necessarily mean it is not a transferee.")

The caselaw finding that an entity is a mere conduit differ from the facts here. In most cases, the recipient was held to be a mere conduit primarily because it did not receive consideration or compensation for its services nor did it have any liability in the transaction as a whole if the transfers had been made to the recipient. In this case, Bear Stearns made $2.4 million profit on the Fund's transactions during its tenure as the Fund's primary broker. Moreover, Bear Stearns used the funds in the account to cover all open positions the Fund had with Bear Stearns for which Bear Stearns would have been liable if the Transfers had not been made. *See cf. Bonded Financial*, 838 F.2d at 893–94 (bank found to be mere conduit had no right to use the transfer it received for any purpose and could only use it as directed by the transferor); *In re Dominion Corp.*, 199 B.R. at 415 (no allegation that transfers at issue conferred any economic benefit on transferee or that transferee had any economic interest in any transactions to which the transfers related).

Under the terms of the Fund's Agreement with Bear Stearns, Bear Sterns had a security interest in any monies transferred; held the monies transferred as

collateral for short sales; had the right to and did prohibit the Fund from withdrawing any of the monies transferred as long as any short position remained open; and had the right to and did use the monies transferred to purchase covering securities, with or without the Fund's consent. Thus, Bear Stearns had the ability to exercise control and use the Transfers to protect its own economic well-being and thus, is not a mere conduit with respect to those Transfers. *Cf. In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d at 59 (Defendant had "no discretion or authority to do anything else but transmit the money"); *Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 103 (Bankr. D.Del.2006) ("To be a 'mere conduit,' a defendant must establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use."); *Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive Corp.)*, 321 B.R. 388, 396 (Bankr.D.Del.2005) ("The essence of dominion is the power to control or direct resources.").

*Bear Stearns Public Policy Argument*

■ Bear Stearns further argues that allowing recovery of margin payments relating to short sale securities transactions is contrary to public policy, an argument previously addressed by this Court in the decision denying Bear Stearns' motion to dismiss. *See In re Manhattan Investment Fund Ltd.*, 310 B.R. at 513. This Court dismissed that argument finding that the Bankruptcy Code specifically provides for such a recovery under 546(e) and 548(a)(1)(A). Bear Stearns now argues that to find a securities brokerage such as itself an initial transferee based on its boilerplate provisions in its Agreement with Berger would expose all other broker-dealers to "massive" amounts of liability

and would cripple the securities industry in the process. As stated in this Court's previous decision, "[a]ware of the necessity of the services provided by clearing brokers, Congress only *limited* trustees' ability to avoid margin payments in bankruptcy under section 546(e) of the Bankruptcy Code." *Id.* The provisions of the Bankruptcy Code work to permit margin payments to be avoided in only limited circumstances shielding brokers from the full reach of the creditor protections of the fraudulent conveyance laws. *Id.* Where the Bankruptcy Code specifically provides for the avoidance of margin payments it cannot be said that allowing just that would be contrary to public policy. *Id.* For all of the reasons articulated in this Court's prior ruling on the Motion to Dismiss as well as those above I find Bear Stearns' "public policy" argument meritless.

*Good Faith Defense*

Bear Stearns asserts that even should it be found to be an initial transferee within the meaning of section 550(a) of the Bankruptcy Code, that if Bear Stearns accepted the transfers from the Fund in good faith under 548(c), without knowledge of the fraud, then the Trustee will not be permitted to recover these monies. The Trustee contends that Bear Stearns' knowledge of the Fund's questionable activity put it on notice of the Ponzi scheme more than a year before the Fund was shut down and investigated by the SEC. She contends that Bear Stearns had the opportunity to discover the Ponzi scheme and therefore was on constructive notice of the Fund's continued fraud.

■ Section 548(c) provides, in relevant part, that to the "extent that a transfer is voidable, a transferee that takes for value and in good faith may retain any interest transferred to the extent that such trans-

feree gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c). Under section 548(c), the transferee of a fraudulent transfer must prove his good faith in order to sustain his defense. *See, e.g., In re Actrade Financial Technologies Ltd.,* 337 B.R. 791, 806 (Bankr.S.D.N.Y.2005) *citing Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.),* 84 F.3d 1330, 1338 (10th Cir.1996); *Breeden v. L.I. Bridge Fund, L.L.C. (In re Bennett Funding Group, Inc.),* 232 B.R. 565, 572–73 (Bankr.N.D.N.Y.1999). There is no dispute that Bear Stearns took the transfers in question for value,[9] however the relevant issue herein is whether or not Bear Stearns took in good faith. Bear Stearns argues that the issue of good faith is one to be determined by a jury; the Trustee argues that the issue can be decided on summary judgment.

That an issue is factual does not necessarily preclude summary judgment. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1435 (9th Cir.1995) *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment must only allege that there is an absence of evidence by which the nonmoving party can prove his case. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d at 1435. The nonmoving party may not rest upon the mere allegations or denials in the pleadings. *See* FED. R. CIV. P. 56(e). However, the burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial. *Dark v. Curry County,* 451 F.3d 1078, 1082 (9th Cir.2006) *citing* 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, Civil 3d § 2727 (1998).

This rule does not direct courts to resolve questions of credibility or conflicting inferences. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d at 1435. What it requires courts to do is assess whether the jury, drawing all inferences in favor of the nonmoving party, could reasonably render a verdict in favor of the nonmoving party in light of the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–52, 106 S.Ct. 2505. The determination requires application of the standard that courts apply in motions for a directed verdict or a judgment notwithstanding the verdict. *See id.* at 251, 106 S.Ct. 2505.

■ The Bankruptcy Code does not define good faith. However, courts have found that "good faith" includes not only "honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage" but also "freedom from knowledge of circumstances which ought to put the holder on inquiry." *In re M & L Business Mach. Co., Inc.,* 84 F.3d at 1335, *citing* BLACK'S LAW DICTIONARY (6th ed.1990). "The presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment." *Id.* at 1335–36.

■ In determining whether or not a transferee lacked the requisite knowledge so as to have been acting in good faith, "courts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint.... At least one court has held that if the circumstances would place a reasonable person

---

**9.** Section 548(d)(2)(B) provides in relevant part that a stockbroker that receives a margin payment, as defined in the Bankruptcy Code, takes for value to the extent of such payment.

on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." *Hayes v. Palm Seedlings Partners (In re Agricultural Research and Technology Group, Inc.),* 916 F.2d 528, 535–36 (9th Cir.1990) *citing Sanitary Ice Vending Co. v. Harris (In re Polar Chips Int'l, Inc.),* 18 B.R. 480 (Bankr.S.D.Fla.1982). Further, a transferee may not remain willfully ignorant of facts that would cause it to be on notice of a debtor's fraudulent purpose, and then "put on 'blinders' prior to entering into transactions with the debtor and claim the benefit of 548(c)." *In re World Vision Entertainment, Inc.,* 275 B.R. 641, 659–60 (Bankr.M.D.Fla.2002) *quoting In re Cannon,* 230 B.R. 546, 592 (Bankr.W.D.Tenn. 1999) *rev'd on other grounds,* 277 F.3d 838 (6th Cir.2002); *In re Model Imperial, Inc.,* 250 B.R. 776, 798 (Bankr.S.D.Fla.2000); *see also In re Sherman,* 67 F.3d 1348, 1355 (8th Cir.1995) ("[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency."); *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 636 (2d Cir.1995), ("[C]onstructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry.").

■ The record reflects undisputed facts demonstrating that Bear Stearns was on inquiry notice as of December 1998 after Mr. Fredrik Schilling, Senior Managing Director and salesperson for Bear Stearns, had a conversation regarding the Fund at a party. In that conversation, Schilling was told by an individual who represented that he was affiliated with European Investment Management "EIM" who had clients that invested in the Fund, that the Fund was reporting a 20% profit for the year. At that time, Schilling was under the impression that the Fund was losing money based on his participation in risk-related conference calls in which the Fund had been mentioned, and consequently, what he was told by this investor did not "sound right." *See* Bear Stearns Mem. in Opp. at 51–2. In fact, by December 1998, the Fund was down $180 million for 1998. Rather than respond to that individual, Schilling suggested that the individual have his boss call Schilling.

The day after this party conversation Schilling relayed the conversation with this investor to his boss, William Gangi, and the then-head of client services Michael Tumulty. *See* Bear Stearns Mem. in Opp. at 53. The same day, Schilling spoke with the EIM representative's boss, Arpad Busson who inquired as to whether the Fund's performance matched Bear Stearns' books and records. *Id.* at 54.

Schilling informed Busson that he would need to make a written inquiry in order to receive a response to that question. *Id.* Thereafter, Schilling spoke with John Callanan in Bear Stearns' portfolio department about the Fund's performance and the books and records and Callanan confirmed that the Fund was losing money in its account at Bear Stearns. *Id.* Schilling also passed on the written request from Busson to Bear Stearns' legal department as well as discussing the situation with senior management at Bear Stearns. *Id.* at 54–5.

These discussions led to a conference call with two then managers in Bear Stearns' relationship management department, Peter Murphy and Christopher Welsh, Financial Asset Management ("FAM"), the Fund's introducing broker, and Michael Berger. *Id.* at 55. Michael Berger explained that the discrepancy in the Fund's performance as described by

EIM and Bear Stearns' records was due to the fact that Bear Stearns was only one of eight or nine prime brokers used by the Fund. *Id.* While there is evidence that Berger's explanation could be plausible, Bear Stearns, apparently wearing "blinders," did nothing to verify this information despite the fact that a simple review of the Fund's financial statements—which was eventually done many months later—would have, and eventually did, reveal that Bear Sterns was the only prime broker for the Fund.[10] Moreover, Bear Stearns' actions following the phone call with Berger demonstrate that it was not completely comfortable with Berger's explanation. For example, Schilling spoke with two partners at Deloitte & Touche, the Fund's auditor, to explain the nature of the inquiry with the Fund made by Busson and Bear Stearns. *Id.* at 59. Schilling "asked that Deloitte & Touche be keen and careful during the Fund's upcoming audit because Deloitte & Touche, as the Fund's auditor, was in a position to oversee all of the Fund's assets." *Id.*

In February 1999, Schilling coincidentally met Busson at a conference in Geneva where he learned that Busson further inquired into the Fund with Berger who would not release any information without a confidentiality agreement. *Id.* at 60. Busson was advised by his counsel not to sign the agreement and told Schilling that EIM had either redeemed or was planning to redeem its clients' investments in the

Fund. *Id.* In the spring of 1999, Deloitte & Touche notified Schilling that the Fund's audit was completed without problem.[11] *Id.* at 61. Even after this call was made, however, Schilling continued to have discussions with investors about investigating Berger and the Fund, and asked the auditors to investigate the Fund again. *Id.*

By August of 1999, the gap between the Fund's purported performance, as reported by Berger, and what the actual performance was had grown to $367 million. A month later, the gap was at nearly $399 million. By the time of the last transfers, in mid-December, the gap stood at more than $423 million. Bear Stearns' internal risk reports show an increase of concern about the Fund during November 1999 and the Fund received margin calls from Bear Stearns on almost a daily basis. "By late 1999" Bear Stearns raised the margin requirement on the Fund from 35% to 50%.[12] When the Fund continued to lose money and with one stock comprising 70% of the portfolio, an email to members of Bear Stearns' risk department suggested that the Fund's position "necessitates higher requirements than 50%." [13]

After another incident Bear Stearns finally took steps to determine what was really going on. In December of 1999, Schilling, while attending a meeting on unrelated business, spoke with Mark Nichols, a former third-party marketer for the Fund, and was told about the termination of Nichols' relationship with Berger and

10. Note 6 of the Fund's Audited Financial Statements stated that "[a]ll security transactions of the Fund are primarily cleared by one broker which exposes the Fund to credit risk." *See* Reynolds Affidavit, Fund Financial Statement, Ex. 93 note 6.

11. It is disputed by the Trustee that this call occurred. *See* Trustee's Reply Mem. at 22 ("... Mr. Schilling's purported receipt of a call from the auditors reporting the issuance of a clean audit- a call that neither of Mr.

Schilling's contacts at Deloitte has any recollection of making.") Drawing the inferences in the light most favorable to the non-moving party, for the purpose of these motions, the Court assumes this call did in fact take place.

12. *See* Reynolds Affidavit, Engdall Deposition, Ex. 67 at 29–30.

13. *See* Reynolds Affidavit, Engdall Deposition, Ex. 67 at 192–93.

the Fund. Bear Stearns Memo in Opp. at 63–4. Nichols informed Schilling that Nichols had had to sue Berger for a substantial amount money that Nichols was allegedly owed for past marketing efforts for the Fund. *Id.* at 64. Learning that Berger breached contractual duties and broken Nichols' trust, Schilling became concerned that Berger may be "immoral" and that led him to initiating further inquiries into the Fund. *See* Reynolds Affidavit Ex. 2 at 396.

Schilling requested, and "someone from Bear Stearns' compliance or margin departments contacted two credit bureaus to inquire as to whether the Fund had relationships with other broker/dealers on the street, but they were only able to verify that the Fund had a relationship with one other broker–a delivery versus payment account held with an executing broker." Bear Stearns Memo in Opp. at 66. Then Schilling and one of his colleagues called several other prime brokers to ask whether or not they worked with the Fund and of those none did business with the Fund. *Id.* Thereafter, Schilling brought the Fund to the attention of senior management at Bear Stearns and met with Richard Lindsey, Co–President of Bear Stearns Securities Corp., bringing him entirely up to speed about the Fund. *Id.* at 67. At this point, Bear Stearns' senior officials, including Lindsey, called Berger who responded with the same answer he gave them one-year prior. *Id.* "When Lindsey asked who the Fund's other prime brokers were, Berger responded that it was none of Bear Stearns' business." *Id.* Eventually, Bear Stearns obtained the Fund's financials by signing a confidentiality agreement. *Id.* After a ten-minute review of the financial statements, the Bear Stearns' people knew there was a problem. First, a footnote stated that "the activity of the [Fund] was predominantly or primarily exclusive at one prime broker." [14] Second, the year-end equity disclosed on the financial statements was substantially greater than what Bear Stearns showed.[15]

Finally, after a phone call from Deloitte indicating that Deloitte could no longer discuss the Fund, Bear Stearns' senior management decided to notify the SEC that there was a potential problem with the Fund. *Id.* at 68. By December 22, the Fund was put on "Closing only" status and asked to leave the firm.[16] The following day, without Berger's permission, Bear Stearns covered all of the Fund's remaining open short positions at a realized loss to the Fund of more than $22 million.

■■■ It is clear from the record that Bear Stearns was on inquiry notice of Berger's fraud from December 1998 and throughout the following year. Based upon the information it had, Bear Stearns was required to do more than simply ask the wrongdoer if he was doing wrong. *See Securities and Exchange Comm. v. Credit Bancorp, Ltd.*, 386 F.3d 438, 452–53 (2d Cir.2004). Diligence requires consulting easily obtainable sources of information that would bear on the truth of any explanation received from the potential wrongdoer. *Id.* The simple steps Bear Stearns finally performed one year later, demonstrate that Bear Stearns failed to act diligently in a timely manner and accordingly, Bear Stearns cannot satisfy its burden of showing that it acted with the diligence

---

14. *See* Reynolds Affidavit, Minikes Deposition, Ex. 92 at 62, 84.

15. *See* Reynolds Affidavit, Minikes Deposition, Ex. 92 at 62.

16. See Reynolds Affidavit, Arpino Memo, Ex. 73.

required to establish good faith under section 548(c) of the Bankruptcy Code.

## Conclusion

For all the reasons set forth above Bear Stearns' motion for summary judgment is denied. The Trustee's motion for summary judgment is granted.

SUBMIT AN ORDER CONSISTENT WITH THE FOREGOING.